## Case No. 15,383.

### UNITED STATES v. HOLMES.

### [1 Wall. Jr. 1.] [1]

Circuit Court, E. D. Pennsylvania.    April 22, 1842.

CONDUCT OF TRIAL—ADMISSION OF PERSONS WITHIN BAR—HOMICIDE BY SEAMEN—SHIPWRECK—ABANDONMENT OF PASSENGERS.

1. Although this court is deprived, by the act of March 2, 1831, of the power to punish, as for a contempt of court, the publication during trial, of testimony in a case, yet, having power to regulate the admission of persons, and the character of proceedings within its own bar, the court can exclude from within the bar any person coming there to report testimony during the trial.

[Cited in U. S. v. Anon., 21 Fed. 768.]

2. Seamen have no right, even in cases of extreme peril to their own lives, to sacrifice the lives of passengers, for the sake of preserving their own. On the contrary, being common carriers, and so paid to protect and carry the passengers, the seamen, beyond the number necessary to navigate the boat, in no circumstances can claim exemption from the common lot of the passengers.

3. In the case here reported, the relative obligations of seamen and passengers, in the event of shipwreck or maritime disaster, are examined and stated.

4. The indictment charged that the prisoner did commit manslaughter on the high seas (1) by casting F. A. from a vessel belonging, etc., whose name was unknown; (2) by casting him from the long-boat of the ship W. B., belonging, etc. The indictment is sufficiently certain.

The American ship William Brown, left Liverpool on the 13th of March, 1841, bound for Philadelphia, in the United States. She had on board (besides a heavy cargo) 17 of a crew, and 65 passengers, Scotch and Irish emigrants. About 10 o'clock on the night of the 19th of April, when distant 250 miles southeast of Cape Race, Newfoundland, the vessel struck an iceberg, and began to fill so rapidly that it was evident she must soon go down. The long-boat and jolly-boat were cleared away and lowered. The captain, the second mate, 7 of the crew, and 1 passenger got into the jolly-boat. The first mate, 8 seamen, of whom the prisoner was one

(these 9 being the entire remainder of the crew), and 32 passengers, in all 41 persons, got indiscriminately into the long-boat.[2] The remainder of the passengers, 31 persons, were obliged to remain on board the ship. In an hour and a half from the time when the ship struck, she went down, carrying with her every person who had not escaped to one or the other of the small boats. Thirty-one passengers thus perished.[3] On the following morning (Tuesday) the captain, being about to part company with the long-boat, gave its crew several directions, and, among other counsel, advised them to obey all the orders of the mate, as they would obey his, the captain's. This the crew promised that they would do. The long-boat was believed to be in general good condition; but she had not been in the water since leaving Liverpool, now thirty-five days; and as soon as she was launched, began to leak. She continued to leak the whole time; but the passengers had buckets, and tins, and, by bailing, were able to reduce the water, so as to make her hold her own. The plug was about an inch and a half in diameter. It came out more than once, and finally, got lost; but its place was supplied by different expedients.

It appeared by the depositions of the captain, and of the second mate,[4] (the latter of whom had followed the sea twenty-one years; the former being, likewise, well-experienced), that on Tuesday morning when the two boats parted company, the long-boat and all on board were in great jeopardy. The gunwale was within from 5 to 12 inches of the water. "From the experience" which they had had, they thought "the long-boat was too unmanageable to be saved." If she had been what, in marine phrase, is called a "leaky boat," she must have gone down. Even without a leak she would not have supported one-half her company, had there been "a moderate blow." "She would have swamped very quickly." The people were half naked, and were "all crowded up together like sheep in a pen." "A very little irregularity in the stowage would have capsized the long-boat." "If she had struck any piece of ice she would inevitably have gone down. There was great

---

[2] The first mate and some of the crew of the long-boat were originally in the jolly-boat with the captain; but the mate, understanding navigation, was transferred, with a chart, quadrant, and compass, to the long-boat; and some of the crew were exchanged. The long-boat was 22½ feet long, 6 feet in the beam, and from 2½ to 3 feet deep.

[3] One passenger had died after leaving Liverpool, and before the catastrophe of the 19th.

[4] The captain and second mate, with the other persons in the jolly-boat, after having been out at sea six days, were picked up by a French fishing lugger. They afterwards came to Philadelphia, where, by consent of the United States, the depositions of the captain and mate were taken, and the testimony was now read in evidence.

[1] [Reported by John William Wallace, Esq.]

peril of ice for any boat." (Captain's and second mate's depositions.) Without going into more detail, the evidence of both these officers went to show that, loaded as the long-boat was on Tuesday morning, the chances of living were much against her. But the captain thought, that even if lightened to the extent to which she afterwards was, "it would have been impossible to row her to land; and that the chances of her being picked up, were ninety-nine to one against her." It appeared, further, that on Monday night, when the passengers on the ship (then settling towards her head and clearly going down) were shrieking. and calling on the captain to take them off on his boat, the mate on the long-boat. said to them: "Poor souls! you're only going down a short time before we do." And, further, that on the following morning, before the boats parted company, the mate, in the long-boat, told the captain, in the jolly-boat, that the long-boat was unmanageable, and, that unless the captain would take some of the long-boat's passengers, it would be necessary to cast lots and throw some overboard. "I know what you mean." or, as stated by one witness, "I know what you'll have to do," said the captain. "Don't speak of that now. Let it be the last resort." There was little or. no wind at this time, but pieces of ice were floating about.

Notwithstanding all this, the long-boat, loaded as she is above described to have been, did survive throughout the night of Monday, the day of Tuesday, and until 10 o'clock of Tuesday night,—full twenty-four hours after the ship struck the iceberg. The crew rowed, turn about, at intervals, and the passengers bailed. On Tuesday morning, after the long-boat and jolly-boat parted, it began to rain, and continued to rain throughout the day and night of Tuesday. At night the wind began to freshen, the sea grew heavier, and once, or oftener, the waves splashed over the boat's bow so as to wet, all over, the passengers who were seated there. Pieces of ice were still floating around, and, during the day, icebergs had been seen. About 10 o'clock of Tuesday night, the prisoner and the rest of the crew began to throw over some of the passengers, and did not cease until they had thrown over 14 male passengers. These, with the exception of two married men and a small boy, constituted all the male passengers aboard. Not one of the crew was cast over. One of them, the cook, was a negro.

It was among the facts of this case that, during these solemn and distressful hours, scarce a remark appeared to have been made in regard to what was going to be done. nor, while it was being done, as to the necessity for doing it. None of the crew of the long-boat were present at the trial, to testify, and. with the exception of one small boy, all the witnesses from the long-boat were women,—mostly quite young. It is

probable that, by Tuesday night (the weather being cold. the persons on the boat partially naked. and the rain falling heavily), the witnesses had become considerably overpowered by exhaustion and cold, having been 24 hours in the boat. None of them spoke in a manner entirely explicit and satisfactory in regard to the most important point, viz. the degree and imminence of the jeopardy at 10 o'clock on Tuesday night, when the throwing over began. As has been stated. few words were spoken. It appeared, only, that, about 10 o'clock of Tuesday night, it being then dark, the rain falling rather heavily, the sea somewhat freshening, and the boat having considerable water in it, the mate, who had been bailing for some time. gave it up, exclaiming: "This work won't do. Help me, God. Men, go to work." Some of the passengers cried out, about the same time: "The boat is sinking. The plug's out. God have mercy on our poor souls." Holmes and the crew did not proceed upon this order; and after a little while, the mate exclaimed again: "Men, you must go to work, or we shall all perish." They then went to work; and, as has been already stated, threw out, before they ended, 14 male passengers, and also 2 women.[5] The mate directed the crew "not to part man and wife, and not to throw over any women." There was no other principle of selection. There was no evidence of combination among the crew. No lots were cast, nor had the passengers, at any time, been either informed or consulted as to what was now done. Holmes was one of the persons who assisted in throwing the passengers over. The first man thrown over was one Riley, whom Holmes and the others told to stand up, which he did. They then threw him over, and afterwards Duffy, who, in vain, besought them to spare him, for the sake of his wife and children, who were on shore. They then seized a third man, but, his wife being aboard, he was spared. Coming to Charles Conlin. the man exclaimed: "Holmes, dear, sure you won't put me out?" "Yes, Charley," said Holmes, "you must go, too." And so he was thrown over. Next was Francis Askin, for the manslaughter of whom the prisoner was indicted. When laid hold of, he offered Holmes five sovereigns to spare his life till morning, "when," said he, "if God don't send us some help, we'll draw lots, and if the lot falls on me, I'll go over like a man." Holmes said, "I don't want your money, Frank," and put him overboard.

[5] It was a matter of doubt whether these women (two sisters of Frank Askin, an Irish youth, spoken of further on) had been thrown over. or whether their sacrifice was an act of self-devotion and affection to their brother. When Holmes seized him, his sisters entreated for his life, and said that if he was thrown over they wished to be thrown over too; that "they wished to die the death of their brother." "Give me only a dress to put around me," said one of the sisters. after her brother had been thrown out, "and I care not now to live longer."

When one McAvoy was seized, he asked for five minutes to say his prayers, and, at the interposition of a negro, the cook, was allowed time to say them before he was cast overboard. It appeared, also, that when Askin was put out, he had struggled violently, yet the boat had not sunk. Two men, very stiff with cold, who had hidden themselves, were thrown over after daylight on Wednesday morning, when, clearly, there was no necessity for it.[6] On Wednesday morning, while yet in the boat, some of the witnesses had told the crew that they (i. e. the crew) should be made to die the death they had given to the others. The boat had provisions for six or seven days, close allowance; that is to say, 75 pounds of bread, 6 gallons of water, 8 or 10 pounds of meat, and a small bag of oatmeal. The mate had a chart, quadrant and compass. The weather was cold, and the passengers, being half clothed, much benumbed. On Wednesday morning the weather cleared, and early in the morning the long-boat was picked up by the ship "Crescent." All the persons who had not been thrown overboard were thus saved.

On the other hand the character of the prisoner stood forth, in many points, in manly and interesting relief. A Finn by birth, he had followed the sea from youth, and his frame and countenance would have made an artist's model for decision and strength. He had been the last man of the crew to leave the sinking ship. His efforts to save the passengers, at the time the ship struck, had been conspicuous, and, but that they were in discharge of duty, would have been called self-forgetful and most generous.[7] As a sail-

or, his captain and the second mate testified that he had ever been obedient to orders, faithful to his duty, and efficient in the performance of it,—"remarkably so," said the second mate. "He was kind and obliging in every respect," said the captain, "to the passengers, to his shipmates, and to everybody. Never heard one speak against him. He was always obedient to officers. I never had a better man on board ship. He was a first-rate man." (Captain's deposition.) While on the long-boat, in order to protect the women, he had parted with all his clothes, except his shirt and pantaloons; and his conduct and language to the women were kind. After Askin had been thrown out, some one asked if any more were to be thrown over. "No," said Holmes, "no more shall be thrown over. If any more are lost, we will all be lost together." Of both passengers and crew, he finally became the only one whose energies and whose hopes did not sink into prostration. He was the first to descry the vessel which took them up, and by his exertions the ship was made to see, and, finally, to save, them.[8]

The prisoner was indicted under the act of April 30, 1790, "for the punishment of cer-

[6] The exact condition of these two men did not appear. Some of the witnesses thought that they were too much frozen to recover. Others swore differently.

[7] On board the long-boat, a widowed mother, a Scotswoman, and her three daughters had escaped; but, just as the boat was about veering astern, and when there was great danger of being drawn into the vortex of the sinking ship, it was discovered that one of the family, a sick sister, had been left behind in the ship. Her mother was calling, "Isabel, Isabel, come, come!" But the girl was too sick to hear or to mind. Holmes, hearing the mother's cry, climbed up the ship's side (at great peril of his life, as was testified), ran astern, and, hoisting the sick girl upon his shoulders, swung himself and her over, by the tackle, by one arm, into the long-boat below. "O, mother, I am coming, I am coming!" responded the girl, as Holmes was lowering himself and her along the ship's side. On the trial, Holmes' counsel, after describing, with effect, the earlier circumstances of the catastrophe, thus opened his defence: "But hark, gentlemen! On that dreadful night, the crew and half the passengers having taken to the boats, the agonized voice of a mother is heard, even beyond the tumult and the outcry, calling for the preservation of her daughter, who, in the consternation of the moment, had been forgotten, and remained on board the fated ship. In an instant you see an athletic sailor passing hand over hand, by means of a slender rope, until he regains the vessel. Behold him now on the quarter-deck, with one arm entwined around a sickly and half naked girl, in the depth of the night, surrounded by icebergs

and the ocean, while, with the other, he swings himself and his almost lifeless burthen from the stern of the sinking ship into the boat below, and restores the child at once to the open arms and yearning heart of her mother. Yet, today, gentlemen, there, before you, sits that selfsame heroic sailor, arraigned upon the charge of having voluntarily and feloniously deprived a fellow creature of his life: and that, gentlemen, is the charge which you are summoned here to determine."

[8] "The passengers, on Wednesday morning," said one of the witnesses, "looked very distressed; and Holmes told them to keep their hearts up." "The mate," said another witness, "asked the men what he should do. Holmes said we ought not to steer for Newfoundland, as we would never reach it, but to go south, as it would be warmer, and we might meet a vessel. The mate said he would do as Holmes wanted. He would give up all to Holmes. * * * I saw Holmes with a quilt. He tried to raise it to make a sail, but the wind was too strong. He then stood up and said that he saw the mast of a vessel, and afterwards got to work to raise a shawl on the end of an oar." In fact, as appeared by other parts of the testimony, Holmes' long-trained, labouring eye descried the Crescent's main-mast, in the distance, several minutes before it was at all visible to anybody on board: and, while most of the boat's assemblage lay yet exhausted or despairing, he had raised the signal of distress. His coolness and deep knowledge of sea life were not less manifested now, than his physical superiority had been before. The great distance of the Crescent rendered it almost impossible that Holmes' signal should be seen. The second mate of the vessel happened, however, to be aloft, watching for ice; and as soon as the ship, responding to the signal, put about, the voice of exultant joy and gratitude burst forth from the wretched assemblage on the long-boat. Some were crawling up the side of the boat to see the approaching vessel, and others, who had seemed congealed, now stood erect; "Lie down," said Holmes, "every soul of you, and be still." "If they make so many of us on board, they will steer off another way, and pretend they have not seen us."

tain crimes against the United States" (1 Story's Laws, 83 [1 Stat. 115]), an act which ordains (section 12) that if any seaman. &c., shall commit manslaughter upon the high seas, &c., on conviction. he shall be imprisoned not exceeding three years. and fined not exceeding one thousand dollars. The indictment charged that Holmes—First. with force, &c., "unlawfully and feloniously" did make an assault. &c., and cast and throw Askin from a vessel, belonging, &c., whose name was unknown, into the high seas, by means of which, &c., Askin, in and with the waters thereof then and there was suffocated and drowned; second, in the same way, on board the long-boat of the ship William Brown, belonging, &c., did make an assault, &c., and cast. &c. The trial of the prisoner came on upon the 13th of April, 1842, a few days before the anniversary of the calamitous events referred to. The case was replete with incidents of deep romance, and of pathetic interest. These, not being connected with the law of the case, of course do not appear in this report; but they had become known, in a general way, to the public, before the trial; and on the day assigned for the trial. at the opening of the court, several stenographers connected with the newspaper press appeared within the bar, ready to report the evidence for their expectant readers.

BALDWIN, Circuit Justice, on taking his seat, now said: "By an act of congress, passed some years since,[9] the court has no longer the power to punish, as for contempt, the publication of testimony pending a trial before us. We have, however, the power to regulate the admissions of persons and the character of proceedings within our own bar; and, as the court perceives several persons apparently connected with the daily press. whose object. we presume, is to report the proceedings and evidence in this case, as it advances. the court takes occasion to state that no person will be allowed to come within the bar. of the court for the purpose of reporting. except on condition of suspending all publication till after the trial is concluded. On compliance with this condition, and not otherwise. the court will direct that a convenient place be afforded to the reporters of the press."

The reporters expressed their acquiescence

[9] Act March 2, 1831 (4 Story's Laws U. S. 2256), by which it is enacted "that the power of the several courts of. the United States to issue attachments and inflict summary punishments for contempt of court. shall not be construed to extend to any cases except the misbehavior of any person or persons in the presence of the said courts. or so near thereto as to obstruct the administration of justice. the misbehaviour of any of the officers of the said courts, in their official transactions, and the disobedience or resistance by any officer of the said courts. party. juror. witness. or any other person or persons. to any lawful writ. process. order. rule. decree or command of the said courts."

in this order of the court, and the most respectful silence, on the part of the press, prevailed during the whole trial.

The prosecution was conducted by Mr. Wm. M. Meredith, U. S. Dist. Atty., Mr. Dallas, and O. Hopkinson; the defence by David Paul Brown, Mr. Hazlehurst, and Mr. Armstrong.

Mr. Dallas. The prisoner is charged with "unlawful homicide," as distinguished from that sort which is malicious. His defence. is that the homicide was necessary to self-preservation. First, then, we ask: Was the homicide thus necessary? That is to say. was the danger instant, overwhelming. leaving no choice of means, no moment for deliberation? For, unless the danger were of this sort. the prisoner, under any admission. had no right, without notice or consultation, or lot, to sacrifice the lives of 16 fellow beings. Peril, even extreme peril. is not enough to justify a sacrifice such as this was. Nor would even the certainty of death be enough. if death were yet prospective. It must be instant. The law regards every man's life as of equal value. It regards it. likewise. as of sacred value. Nor may any man take away his brother's life, but where the sacrifice is indispensable to save his own. (Mr. Dallas then examined the evidence, and contended that the danger was not so extreme as is requisite to justify homicide.) But it will be answered, that death being certain, there was no obligation to wait until the moment of death had arrived. Admitting, then, the fact that death was certain, and that the safety of some persons was to be promoted by an early sacrifice of the others, what law, we ask, gives a crew, in such a case, to be the arbiters of life and death, settling, for themselves both the time and the extent of the necessity? No. We protest against giving to seamen the power thus to make jettison of human beings, as of so much cargo; of allowing sailors, for their own safety, to throw overboard, whenever they may like, whomsoever they may choose. If the mate and seamen believed that the ultimate safety of a portion was to be advanced by the sacrifice of another portion. it was the clear duty of that officer, and of the seamen, to give full notice to all on board. Common settlement would, then. have fixed the principle of sacrifice, and, the mode of selection involving all, a sacrifice of any would have been resorted to only in dire extremity. Thus far, the argument admits that, at sea. sailor and passenger stand upon the same base, and in equal relations. But we take, third, stronger ground. The seaman. we hold, is bound, beyond the passenger, to encounter the perils of the sea. To the last extremity. to death itself. must he protect the passenger. It is his duty. It is on account of these risks that he is paid. It is because the sailor is expected to expose himself to every danger. that. beyond all mankind. by every law. his wages are se-

cured to him   It is for this exposure that the seamen's claims are a "sacred lien," and "that if only a single nail of the ship is left, they are entitled to it." 3 Kent, Comm. 197, and in note.   Exposure, risk, hardship, death, are the sailor's vocation.—the seaman's daily bread. He must perform whatever belongs to his duty.   To this effect speaks Lord Bacon, when he says "that the law imposeth it upon every subject that he prefer the urgent service of his prince and country before the safety of his life." His lordship goes on to say that, "if a man be commanded to bring ordnance or munition to relieve any of the king's towns that are distressed, then he cannot, for any danger of tempest, justify the throwing of them overboard; for there it holdeth which was spoken by the Roman when he alleged the same necessity of weather to hold him from embarking: 'Necesse est et ut eam; non ut vivam.'" 13 Bacon's Works, by Montagu (Lond. 1831) p. 161.[10]  No other doctrine than this one can be adopted.  Promulgate as law that the prisoner is guiltless, and our marine will be disgraced in the eyes of civilized nations.   The thousand ships which now traverse the ocean in safety will be consigned to the absolute power of their crews, and, worse than the dangers of the sea, will be added such as come from the violence of men more reckless than any upon earth.

Mr. Armstrong opened the defence, and was followed by Mr. Brown.

We protest against the prisoner being made a victim to the reputation of the marine law of the country.   It cannot be, God forbid that it should ever be, that the sacrifice of innocence shall be the price at which the name and honour of American jurisprudence is to be preserved in this country, or in foreign lands.   The malediction of an unright-

eous sentence will rest more heavily on the law, than on the prisoner.   This court (it would be indecent to think otherwise) will administer the law. "uncaring consequences." But this case should be tried in a long-boat, sunk down to its very gunwale with 41 half naked, starved, and shivering wretches,—the boat leaking from below, filling from above, a hundred leagues from land, at midnight, surrounded by ice, unmanageable from its load, and subject to certain destruction from the change of the most changeful of the elements, the winds and the waves.   To these superadd the horrours of famine and the recklessness of despair, madness, and all the prospects, past utterance, of this unutterable condition.   Fairly to sit in judgment on the prisoner, we should, then, be actually translated to his situation.   It was a conjuncture which no fancy can image.   Terrour had assumed the throne of reason, and passion had become judgment.   Are the United States to come here, now, a year after the events, when it is impossible to estimate the elements which combined to make the risk, or to say to what extent the jeopardy was imminent?   Are they, with square, rule and compass, deliberately to measure this boat, in this room, to weigh these passengers, call in philosophers, discuss specific gravities, calculate by the tables of a life insurance company the chances of life, and because they, these judges, find that, by their calculation, this unfortunate boat's crew might have had the thousandth part of one -poor chance of escape, to condemn this prisoner to chains and a dungeon, for what he did in the terrour and darkness of that dark and terrible night. Such a mode of testing men's acts and motives is monstrous.   We contend, therefore, that what is honestly and reasonably believed to be certain death will justify self-defence to the degree requisite for excuse. According to Dr. Rutherford (Inst. Nat. Law, bk. 1, c. 16. § 5): "This law."—i. e. the law of nature.—"cannot be supposed to oblige a man to expose his life to such dangers as may be guarded against, and to wait till the danger is just coming upon him, before it allows him to secure himself."   In other words, he need not wait till the certainty of the danger has been proved, past doubt, by its result.   Yet this is the doctrine of the prosecution.   They ask us to wait until the boat has sunk.   We may, then, make an effort to prevent her from sinking.   They tell us to wait till all are drowned.   We may, then, make endeavours to save a part.   They command us to stand still till we are all lost past possibility of redemption, and then we may rescue as many as can be saved.   Where the danger is instantaneous, the mind is too much disturbed, says Rutherford, in a passage hereafter cited, to deliberate upon the method of providing for one's own safety, with the least hurt to an aggressor.   The same author then proceeds: "I see not, therefore, any want of benevolence which can be

[10] The navy and army chronicles of England record many examples of Bacon's noble thought: "The duties of life are more than life." And certainly, in whatever circumstances witnessed, such testimonials will prove a vindication of all that counsel here asserted. But most of these heroic examples (some of which were cited in the argument) have been on the part of officers, in England especially, men of high associations, and often highly educated. And we are ready to resolve much into the instinct of discipline, and much, perhaps, into the incentive of ambition, seeking the bubble reputation. An example more impressive than any of these, as it was that of a common sailor, occurred in our country, on Lake Erie, in the destruction of the steamboat Erie by fire, on the afternoon of the 9th of August, 1841. As soon as it was discovered that the flames could not be controlled, the captain ordered the helmsman to make for land, then within sight. The man accordingly turned the vessel. The fire having taken near midships, quickly reached the binnacle. Yet the man kept his post, and his hand was on the wheel. The wreathing flames ere long enclosed him, and when every soul had left the ship, his form was still to be seen amidst the flames, his clothes dropping from him, standing like a man of steel, and in performance of his duty, steering the flaming vessel to a headland.

reasonably charged upon a man in these circumstances, if he takes the most obvious way of preserving himself, though perhaps some other method might have been found out, which would have preserved him as effectually, and have produced less hurt to the aggressor, if he had been calm enough, and had been allowed time enough to deliberate about it." Rutherf. Inst. Nat. Law, bk. 1, c. 16, § 5. Nor is this the language of approved text writers alone. The doctrine has the solemnity of judicial establishment. In Grainger v. State, 5 Yerg. 459, the supreme court of Tennessee deliberately adjudge, that "if a man, though in no great danger of serious bodily harm, through fear, alarm, or cowardice, kill another under the impression that great bodily injury is about to be inflicted on him, it is neither manslaughter nor murder, but self-defence." "It is a different thing," say the supreme court of the United States, in The Mariana Flora, 11 Wheat. [24 U. S.] 51, "to sit in judgment upon this case, after full legal investigations, aided by the regular evidence of all parties, and to draw conclusions at sea, with very imperfect means of ascertaining facts and principles which ought to direct the judgment." The decision in the case just cited, carried out this principle into practice, as the case of The Louis, 2 Dod. 264, decided by Sir William Scott, had done before. The counsel cited Lord Bacon, likewise (Works, by Montagu, vol. 13, Lond. 1831, p. 160), and 4 Bl. Comm. p. 186. But the prospect of sinking was not imaginary. It was well founded. It is not to be supposed that Holmes, who, from infancy, had been a child of the ocean, was causelessly alarmed; and, there being no pretence of animosity, but the contrary, we must infer that the peril was extreme. As regards the two men cast over on Wednesday, the presumption is that they were either frozen, or freezing to death. There being, at this time, no prospect of relief, the act is deprived of its barbarity. The evidence is that the two men were "very stiff with cold." Besides, this indictment is in regard to Askin alone. There is no evidence of inhumanity on Tuesday night, when this throwing over began; though it is possible enough, that, having proceeded so far in the work of horrour, the feelings of the crew became, at last, so disordered as to become unnatural. (The learned counsel then examined the evidence, in order to shew the extremity of the danger.)

Counsel say that lots are the law of the ocean. Lots, in cases of famine, where means of subsistence are wanting for all the crew, is what the history of maritime disaster records; but who has ever told of casting lots at midnight, in a sinking boat, in the midst of darkness, of rain, of terrour, and of confusion? To cast lots when all are going down, but to decide who shall be spared, to cast lots when the question is, whether any can be saved, is a plan easy to suggest, rather difficult to put in practice. The danger

was instantaneous, a case, says Rutherford (Inst. Nat. Law, bk. 1, c. 16, § 5), when "the mind is too much disturbed to deliberate," and where, if it were "more calm," there is no time for deliberation. The sailors adopted the only principle of selection which was possible in an emergency like theirs,—a principle more humane than lots. Man and wife were not torn asunder, and the women were all preserved. Lots would have rendered impossible this clear dictate of humanity. But again: The crew either were in their ordinary and original state of subordination to their officers, or they were, in a state of nature. If in the former state, they are excusable in law, for having obeyed the order of the mate,—an order twice imperatively given. Independent of the mate's general authority in the captain's absence, the captain had pointedly directed the crew to obey all the mate's orders as they would his, the captain's; and the crew had promised to do so. It imports not to declare that a crew is not bound to obey an unlawful order, for to say that this order was unlawful is to postulate what remains to be proved. Who is to judge of the unlawfulness? The circumstances were peculiar. The occasion was emergent, without precedent, or parallel. The lawfulness of the order is the very question which we are disputing; a question about which this whole community has been agitated, and is still divided; the discussion of which crowds this room with auditors past former example; a question which this court, with all its resources, is now engaged in considering, as such a question demands to be considered, most deliberately, most anxiously, most cautiously. It is no part of a sailor's duty to moralize and to speculate, in such a moment as this was, upon the orders of his superiour officers. The commander of a ship, like the commander of an army, "gives desperate commands. He requires instantaneous obedience." The sailor, like the soldier, obeys by instinct. In the memorable, immortal words of Carnot, when he surrendered Antwerp in obedience to a command which his pride, his patriotism, and his views of policy all combined to oppose: "The armed force is essentially obedient. It acts, but never deliberates." This greatest man of the French Revolution did here but define, with the precision of the algebraist, what he conceived with the comprehension of a statesman; and his answer was justification with every soldier in Europe. How far the principle was felt by this crew, let witness the case of this very mate, and of some of these very sailors, who, by the captain's order, left the jolly-boat, which had but 10 persons, for the long-boat, with more than four times that number. See ante, p. 360, note 2. They all regarded this as going into the jaws of death. Yet not a murmur. It is a well-known fact that in no marine on the ocean is obedience to orders so habitual and so implicit as in our own. The prisoner had been always distinguished

by obedience. Whether the mate, if on trial here, would be found innocent, is a question which we need not decide. That question is a different one from the guilt or innocence of the prisoner, and one more difficult. But if the whole company were reduced to a state of nature, then the sailors were bound to no duty, not mutual, to the passengers. The contract of the shipping articles had become dissolved by an unforeseen and overwhelming necessity. The sailor was no longer a sailor, but a drowning man. Having fairly done his duty to the last extremity, he was not to lose the rights of a human being, because he wore a roundabout instead of a frock coat. We do not seek authorities for such doctrine. The instinct of these men's hearts is our authority,—the best authority. Whoever opposes it must be wrong, for he opposes human nature. All the contemplated conditions, all the contemplated possibilities of the voyage, were ended. The parties, sailor and passenger, were in a new state. All persons on board the vessel became equal. All became their own lawgivers; for artificial distinctions cease to prevail when men are reduced to the equality of nature. Every man on board had a right to make law with his own right hand, and the law which did prevail on that awful night having been the law of necessity, and the law of nature too, it is the law which will be upheld by this court, to the liberation of this prisoner.

On the 22d of April, the same day, Mr. Meredith, district attorney, replied, speaking principally to the evidence.

BALDWIN, Circuit Justice, charging jury, alluded to the touching character of the case; and, after stating to the jury what was the offence laid in the indictment, his honour explained, with particularity, the distinction between murder and manslaughter. He said that malice was of the essence of murder, while want of criminal intention was consistent with the nature of manslaughter. He impressed strongly upon the jury, that the mere absence of malice did not render homicide excusable; that the act might be unlawful, as well as the union of the act and intention, in which union consisted the crime of murder. After giving several familiar instances of manslaughter, to explain that, although homicide was committed, there was yet an absence of bad motive, his honour proceeded with his charge nearly as follows:

In such cases, the law neither excuses the act nor permits it to be justified as innocent; but, although inflicting some punishment, she yet looks with a benignant eye, through the thing done, to the mind and to the heart; and when, on a view of all the circumstances connected with the act, no evil spirit is discerned, her humanity forbids the exaction of life for life. But though, said the court, cases of this kind are viewed with tenderness, and punished in mercy, we must yet bear in mind that man, in taking away the life of a fellow being, assumes an awful responsibility to God, and to society; and that the administrators of public justice do themselves assume that responsibility if, when called on to pass judicially upon the act, they yield to the indulgence of misapplied humanity. / It is one thing to give a favourable interpretation to evidence in order to mitigate an offence. It is a different thing, when we are asked, not to extenuate, but to justify, the act. In the former case, as I have said, our decision may in some degree be swayed by feelings of humanity; while, in the latter, it is the law of necessity alone which can disarm the vindicatory justice of the country. Where, indeed, a case does arise, embraced by this "law of necessity," the penal laws pass over such case in silence: for law is made to meet but the ordinary exigencies of life. But the case does not become "a case of necessity," unless all ordinary means of self preservation have been exhausted. The peril must be instant, overwhelming, leaving no alternative but to lose our own life, or to take the life of another person. An illustration of this principle occurs in the ordinary case of self-defense against lawless violence, aiming at the destruction of life, or designing to inflict grievous injury to the person; and within this range may fall the taking of life under other circumstances where the act is indispensably requisite to self-existence. For example, suppose that two persons who owe no duty to one another that is not mutual, should, by accident, not attributable to either, be placed in a situation where both cannot survive. Neither is bound to save the other's life by sacrificing his own, nor would either commit a crime in saving his own life in a struggle for the only means of safety. Of this description of cases are those which have been cited to you by counsel, from writers on natural law,—cases which we rather leave to your imagination than attempt minutely to describe. And I again state that when this great "law of necessity" does apply, and is not improperly exercised, the taking of life is devested of unlawfulness.

But in applying this law, we must look, not only to the jeopardy in which the parties are, but also to the relations in which they stand. The slayer must be under no obligation to make his own safety secondary to the safety of others. A familiar application of this principle presents itself in the obligations which rest upon the owners of stages, steamboats, and other vehicles of transportation. In consideration of the payment of fare, the owners of the vehicle are bound to transport the passengers to the place of contemplated destination. Having, in all emergencies, the conduct of the journey, and the control of the passengers, the owners rest under every obligation for care, skill, and general capacity; and if, from defect of any of these requisites, grievous injury is done

to the passenger, the persons employed are liable. The passenger owes no duty but submission. He is under no obligation to protect and keep the conductor in safety, nor is the passenger bound to labour, except in cases of emergency, where his services are required by unanticipated and uncommon danger. Such, said the court, is the relation which exists on shipboard. The passenger stands in a position different from that of the officers and seamen. It is the sailor who must encounter the hardships and perils of the voyage. Nor can this relation be changed when the ship is lost by tempest or other danger of the sea, and all on board have betaken themselves, for safety, to the small boats: for imminence of danger can not absolve from duty. The sailor is bound, as before, to undergo whatever hazard is necessary to preserve the boat and the passengers. Should the emergency become so extreme as to call for the sacrifice of life, there can be no reason why the law does not still remain the same. The passenger, not being bound either to labour or to incur the risk of life, cannot be bound to sacrifice his existence to preserve the sailor's. The captain, indeed, and a sufficient number of seamen to navigate the boat, must be preserved; for, except these abide in the ship, all will perish. But if there be more seamen than are necessary to manage the boat, the supernumerary sailors have no right, for their safety, to sacrifice the passengers. The sailors and passengers, in fact, cannot be regarded as in equal positions. The sailor (to use the language of a distinguished writer) owes more benevolence to another than to himself. He is bound to set a greater value on the life of others than on his own. And while we admit that sailor and sailor may lawfully struggle with each other for the plank which can save but one, we think that, if the passenger is on the plank, even "the law of necessity" justifies not the sailor who takes it from him. This rule may be deemed a harsh one towards the sailor, who may have thus far done his duty, but when the danger is so extreme, that the only hope is in sacrificing either a sailor or a passenger, any alternative is hard; and would it not be the hardest of any to sacrifice a passenger in order to save a supernumerary sailor?

But, in addition, if the source of the danger have been obvious, and destruction ascertained to be certainly about to arrive, though at a future time, there should be consultation, and some mode of selection fixed, by which those in equal relations may have equal chance for their life. By what mode, then, should selection be made? The question is not without difficulty; nor do we know of any rule prescribed, either by statute or by common law, or even by speculative writers on the law of nature. In fact, no rule of general application can be prescribed for contingencies which are wholly unforeseen. There is, however, one condition of extremity for which all writers have prescribed the same rule. When the ship is in no danger of sinking, but all sustenance is exhausted, and a sacrifice of one person is necessary to appease the hunger of others, the selection is by lot. This mode is resorted to as the fairest mode, and, in some sort, as an appeal to God, for selection of the victim. This manner, obviously, was regarded by the mate, in parting with the captain, as the one which it was proper to adopt, in case the long-boat could not live with all who were on board on Tuesday morning. The same manner, as would appear from the response given to the mate, had already suggested itself to the captain. For ourselves, we can conceive of no mode so consonant both to humanity and to justice; and the occasion, we think, must be peculiar which will dispense with its exercise. If, indeed, the peril be instant and overwhelming, leaving no chance of means, and no moment for deliberation, then, of course, there is no power to consult, to cast lots, or in any such way to decide; but even where the final disaster is thus sudden, if it have been foreseen as certainly about to arrive, if no new cause of danger have arisen to bring on the closing catastrophe, if time have existed to cast lots, and to select the victims, then, as we have said, sortition should be adopted. In no other than this or some like way are those having equal rights put upon an equal footing, and in no other way is it possible to guard against partiality and oppression, violence and conflict. What scene, indeed, more horrible, can imagination draw than a struggle between sailor and sailor, passenger and passenger, or, it may be, a mixed affray, in which, promiscuously, all destroy one another? This, too, in circumstances which have allowed time to decide, with justice, whose life should be calmly surrendered.

When the selection has been made by lots, the victim yields of course to his fate, or, if he resist, force may be employed to coerce submission. Whether or not "a case of necessity" has arisen, or whether the law under which death has been inflicted have been so exercised as to hold the executioner harmless, cannot depend on his own opinion; for no man may pass upon his own conduct when it concerns the rights, and especially, when it affects the lives, of others. We have already stated to you that, by the law of the land, homicide is sometimes justifiable; and the law defines the occasions in which it is so. The transaction must, therefore, be justified to the law; and the person accused rests under obligation to satisfy those who judicially scrutinize his case that it really transcended ordinary rules. In fact, any other principle would be followed by pernicious results, and, moreover, would not be practicable in application. Opinion or belief may be assumed, whether it exist or not: and if this mere opinion of the sailors will justify them in making a sacrifice of the passengers, of course,

the mere opinion of the passengers would, in turn, justify these in making a sacrifice of the sailors. The passengers may have confidence in their own capacity to manage and preserve the boat, or the effort of either sailors or passengers to save the boat, may be clearly unavailing; and what, then, in a struggle against force and numbers, becomes of the safety of the seamen? Hard as is a seaman's life, would it not become yet more perilous if the passengers, who may outnumber them tenfold, should be allowed to judge when the dangers of the sea will justify a sacrifice of life? We are, therefore, satisfied, that, in requiring proof, which shall be satisfactory to you, of the existence of the necessity, we are fixing the rule which is, not merely the only one which is practicable, but, moreover, the only one which will secure the safety of the sailors themselves.

The court said, briefly, that the principles which had been laid down by them, as applicable to the crew, applied to the mate likewise, and that his order (on which much stress had been laid), if an unlawful order, would be no justification to the seamen, for that even seamen are not justified, in law, by obedience to commands which are unlawful. The court added that the case was one which involved questions of gravest consideration, and, as the facts, in some sort, were without precedent, that the court preferred to state the law, in the shape of such general principles as would comprehend the case, under any view which the jury might take of the evidence.

After a few remarks upon the evidence, the case was given to the jury, who, about 16 hours afterwards, and after having once returned to the bar, unable to agree, with some difficulty, found a verdict of guilty. The prisoner was, however, recommended to the mercy of the court. On the same day a rule was obtained to show cause why judgment should not be arrested and a new trial granted. The following ground was relied on for a new trial: Because the court, instead of telling the jury that, in a state of imminent and deadly peril, all men are reduced to a state of nature, and that there is, then, no distinction between the rights of sailor and passenger, adopted a contrary doctrine, and charged the jury accordingly.

Mr. Brown subsequently showed cause. He insisted largely upon the existence of the state of nature, as distinguished from the social state, and contended that to this state of nature the persons in the long-boat had become reduced on Tuesday night, at 10 o'clock, when Askin was thrown overboard. He iterated, illustrated, and enforced the argument contained in the closing part of the defence. For the arrest of judgment he argued that the indictment was defective in not stating the name of the boat on which the homicide was alleged to have been committed; that the counts in this respect wanted certainty. The United States did not reply.

THE COURT held the application for some days under advisement, and, at a subsequent day, discharged the rule. They said that, during the trial (aware that no similar case was recorded in juridical annals), they had given to the subject studious and deliberate consideration, and they had paid like regard to what was now urged, but that, notwithstanding all that had been said (and the arguments, it was admitted, were powerful), no error had been perceived by the court, in its instructions to the jury. It is true, said the court, as is known by every one, that we do find in the text writers, and sometimes in judicial opinions, the phrases, "the law of nature," "the principles of natural right," and other expressions of a like signification; but, as applied to civilized men, nothing more can be meant by those expressions than that there are certain great and fundamental principles of justice which, in the constitution of nature, lie at the foundation and make part of all civil law, independently of express adoption or enactment. And to give to the expressions any other signification, to claim them as shewing an independent code, and one contrariant to those settled principles, which, however modified, make a part of civil law in all Christian nations, would be to make the writers who use the expressions law down as rules of action, principles which, in their nature, admit of no practical ascertainment or application. The law of nature forms part of the municipal law; and, in a proper case (as of self-defence), homicide is justifiable, not because the municipal law is subverted by the law of nature, but because no rule of the municipal law makes homicide, in such cases, criminal. It is, said the court, the municipal or civil law, as thus comprehensive, as founded in moral and social justice,—the law of the land, in short, as existing and administered amongst us and all enlightened nations,—that regulates the social duties of men, the duties of man towards his neighbour, everywhere. Everywhere are civilized men under its protection; everywhere, subject to its authority. It is part of the universal law. We cannot escape it in a case where it is applicable; and if, for the decision of any question, the proper rule is to be found in the municipal law, no code can be referred to as annulling its authority. Varying however, or however modified, the laws of all civilized nations, and, indeed, the very nature of the social constitution, place sailors and passengers in different relations. And, without stopping to speculate upon over-nice questions not before us, or to involve ourselves in the labyrinth of ethical subtleties, we may safely say that the sailor's duty is the protection of the persons intrusted to his care, not their sacrifice,—a duty we must again declare our opinion, that rests on him in every emergency of his calling, and from which it would be senseless, indeed, to ab-

solve him exactly at those times when the obligation is most needed.

Respecting the form of the counts, the court said that the locality of the offence was sufficiently expressed, and that, in a case so peculiar, it was impossible to express the place with more precision.

When the prisoner was brought up for sentence, the learned judge said to him, that many circumstances in the affair were of a character to commend him to regard, yet, that the case was one in which some punishment was demanded; that it was in the power of the court to inflict the penalty of an imprisonment for a term of three years, and a fine of $1,000, but, in view of all the circumstances, and especially as the prisoner had been already confined in gaol several months, that the court would make the punishment more lenient. The convict was then sentenced to undergo an imprisonment in the Eastern Penitentiary of Pennsylvania, (solitary confinement) at hard labour, for the term of six months, and to pay a fine of $20.

NOTE. Considerable sympathy having been excited in favour of Holmes, by the popular press, an effort was made by several persons, and particularly by the Seamen's Friend Society, to obtain a pardon from the executive. President Tyler refused, however, to grant any pardon, in consequence of the court's not uniting in the application. The penalty was subsequently remitted.