LEWIS (CROCKER v.). See Case No. 3,399.

LEWIS (DAVIDSON v.). See Case No. 3,606.

## Case No. 8,321.

LEWIS et al. v. The ELIZABETH AND JANE.

[1 Ware (41), 33; [1] 7 Am. Jur. 30.]

District Court, D. Maine. Sept. Term, 1823.

SEAMEN'S WAGES — WRECK — ABANDONING THE WRECK—WHEN DERELICT—SALVAGE.

1. The wreck of a ship is pledged by the maritime law for the payment of wages, and the seamen's privilege is preferred to all other claims.
[Cited in Packard v. The Louisa, Case No. 10,652; Davis v. Leslie, Id. 3,639.]

2. But if they abandon the wreck, the contract between them and the owners is dissolved; they lose their privilege against the ship and their claim for wages, and they are not restored, by the jus postliminii, on the salvage of the property by other persons.
[Cited in Pitman v. Hooper, Case No. 11,185. Distinguished in The Massasoit, Case No. 9,260; Hanson v. Rowell, Id. 6,043. Cited in The Niphon's Crew, Case No. 10.277.]

3. The policy of the law is to connect the right to wages with the safety of the ship.

4. Property is derelict, in the maritime sense of the word, when it is abandoned without hope of recovery, or the intention of returning to save it.

5. The rights of the owner are not divested by abandonment, but the finder becomes the legal possessor, and acquires a privilege against the property for his salvage, which takes precedence of all other liens.
[Cited in Packard v. The Louisa, Case No. 10,652; The John Wurts, Id. 7,434.]
[Cited in Eads v. Brazelton, 22 Ark. 499.]

In admiralty.

C. S. Daveis, for petitioners.
Mr. Whitman, for owners.

WARE, District Judge. This is a petition for wages against the proceeds of the wreck of the brig Elizabeth and Jane, which was ordered at a former term to be sold for the payment of salvage, and the proceeds of the sale to be brought into the registry. One half of the gross amount has been decreed to the salvors, and the seamen now claim their wages out of the surplus remaining in court. If wages are due, the claim may be well enforced in this proceeding. By the marine law, the ship, and even the wreck, as the old ordinances express it, is, to the last nail, pledged to the seamen for their wages. Their lien is preferred to all others, and the reason given is, because it is their labor that has saved all. Consulat de la Mer, cc. 58, 63, 258, 193; Cleirac, Jurisdiction de la Marine, p. 351, art. 18; Abb. Shipp. 538; [Blaine v. The Charles Carter] 4 Cranch [8 U. S.] 328; Relf v. The Maria [Case No. 11,692]; 1 Valin, Comm. 703; Laws of Oleron, p. 751, art. 3.

The facts in the case are these:—The seamen shipped in St. Domingo, for a voyage to the United States, and the brig sailed with a cargo of mahogany about the first of January, 1823. Meeting with bad weather on the

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

coast, she was driven about without being able to make a port, until about eighty or ninety days after leaving St. Domingo, when she struck on a reef of rocks, was wrecked, and abandoned by the crew. The men suffered, not only from the severity of the weather, but from want of provisions, having been for a considerable part of the time on short allowance. The wreck was afterwards picked up and brought in by the schooner Merit, Capt. Sylvester. The seamen now claim wages out of the savings of the wreck, and an additional sum, under the statute, for the time they were on short allowance. No evidence was offered as to the latter claim, and I understood at the argument that it was abandoned. The question presented by the case, is, whether, after shipwreck, and abandonment by the crew, wages are due, provided the wreck is saved by other persons, independent of any agency on their part. On the general principles of the contract of hire, wages may, without doubt, be claimed. A mechanic, who is hired by the day or month to build a house, does not lose his wages because the building is accidentally destroyed before it is completed. But the contract of hire for marine service stands on reasons peculiar to itself. It is a principle of every maritime code that wages are dependent on the safe delivery of the thing. If ship and cargo are lost, wages are lost. It is the policy of the law to connect, by the strongest ties, the interest of the crew with the safety of property exposed to peculiar risks. In the event of shipwreck, so long as they remain attached to the ship, they keep alive their claim to wages; and if part is saved by their labor, though the authorities are not uniform, on principle, it can hardly be denied that either full wages are due, or, at least, in proportion to what is saved, and according to the circumstances of the case, the seamen may claim an additional compensation, in the nature of salvage.

But when they abandon the wreck, and leave it derelict, a very different case is presented. It may aid in coming to a correct decision of the question, to consider the situation and incidents of property thus abandoned. Property is derelict, in the maritime sense of the word, when it is abandoned without hope of recovery, without an intention of returning. A temporary abandonment, for the purpose of providing more effectual means of saving it, does not constitute a derelict. For this purpose the abandonment must be final, without the intention of returning and resuming the possession. The property of the owner in the thing is not in this case divested. The law still considers him as the proprietor, and protects his interest. By the civil law, the purloining of goods shipwrecked or thrown overboard in a tempest, subjects the intermeddler to the action of theft. But any person who finds the goods may take possession of them; and it results from the marine law that he acquires the legal possession, and a legal interest in the property, that is, a title to a reward for saving it, which he may enforce against the thing itself; or he may deliver it to the owner, and proceed in the admiralty by a libel in personam. The Hope, 3 C. Rob. Adm. 215; The Trelawney, 4 C. Rob. Adm. 223. The thing itself becomes bound to him for the salvage, and he may retain it until he obtains a satisfaction. This right of possession is necessarily exclusive of that of all other persons, because his interest in the thing takes priority of all other interests.

The finder is bound to keep the goods with ordinary care, at least, and without fraud. The legal effect of plunderage or embezzlement on the part of the salvor, and on principle also, it would seem, of that gross negligence, negligentia proxima dolo, which the law holds as constructive fraud, is, that the salvor forfeits his claim to salvage, and the owner recovers his goods, discharged of the lien. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240. But it is from the salvor only that the owner can receive his goods, and to the owner only is the salvor accountable. The master and the mariners, having lost the possession, cannot resume it. These are familiar and well-established principles of the marine law. It remains to be seen how they affect the claim of wages. The general rule, founded on principles of policy, is, that wages are dependent on the successful termination of the voyage. Seamen have then their threefold remedy, against the master, the owners, and the ship. Until that time their right to wages, and consequently their lien on the ship, are but inchoate and contingent. They become perfect on her safe arrival at the port of destination. Any misfortune that destroys the voyage, puts an end to the claim for wages, or rather prevents its ever coming to maturity. Shipwreck, followed by abandonment, seems necessarily to involve this consequence. The contract is dissolved. The connection of the crew with the ship is at an end. The property is derelict, and the finder acquires a possession and an interest, which the master and mariners cannot legally disturb. They have no longer a right to intermeddle with the goods. The rights of the owner continue, but if he does not appear and make his claim within a year and a day, the title, subject to the salvor's lien, by the law of nations, as now understood, accrues to the sovereign. The Aquila, 1 C. Rob. Adm. 37; Valin, Comm. L. 4, tit. 9, art. 27; Jac. Sea Laws, bk. 4, c. 4. I know of no principle of law which authorizes the carrier, master, or mariners, to intercept the goods between the salvor and the owner. On the contrary, it seems to be the uniform language of jurists, that the goods come to the owner burdened only with salvage. It appears to be a necessary result, from these principles, that the

claim for wages is extinguished by shipwreck and abandonment, and that the benefit of the jus postliminii does not arise on the salvage of the goods by other persons.

The question of freight was collaterally introduced into the argument in support of the claim for wages. It does not arise indeed in this case, the owner of the ship and cargo being the same. · But it is contended that, on the principles of the marine law, the ship being preserved in specie, and the lading brought into port in her. and received by the owner or insurer, freight must ·be considered as earned; and if so, that wages follow of course. In answer to this argument it may be said that the principles before stated apply with as much force to the question of freight as wages. The merchant receives his goods, but with the deduction of salvage, and they are delivered, not by the ship-owner, but by the salvor. The possession of the salvor deprives the carrier of the capacity of performing this essential part of the contract. On the whole, it seems a fair deduction from these premises, that, by shipwreck with abandonment by the crew, the contract is totally dissolved. Such seems to me to be the legitimate inference from the acknowledged principles of the marine law; and so the law is stated by the learned editor of Abb. Shipp. p. 512. The authorities are not, however, so explicit on the subject as might have been expected, and perhaps not wholly reconcilable. In the case of Frothingham v. Prince, 3 Mass. 563, (and see Abb. 498, note,) the cargo and freight were wholly lost, and the wreck only of the vessel saved. The court decided that full wages were due to the time of the shipwreck, though the amount was nearly equal to the whole value of the wreck saved. The report is short and confused, and it does not appear certain whether the salvage was effected by the crew or not. But from the circumstances stated, it is rather to be presumed that it was. Taking the facts to be so, this case is supported in principle by the case of Weeks v. The Catharine Maria [Case No. 17,351], decided by Judge Hopkinson, and Taylor v. The Cato [Id. 13,786], decided by Judge Peters. In both these cases the court lays stress on the services of the seamen in effecting the salvage; and in both a doubt seems to have existed whether full wages should be allowed, or only in proportion to what was saved. "So long," says Judge Hopkinson, "as the duty of the mariners calls for their attention and services in the preservation of the ship and cargo, or any part thereof, so long does their lien for wages enure, at least in proportion to the value of the property saved." In the case of Luthridge v. Gray, Abb. 340, which was originally brought in the court of admiralty in Scotland, and, after going through the Scottish courts, was finally decided by the house of lords, it was settled that freight is due on goods saved from shipwreck, though ·

some of them may have been so much injured as to be of no value. See, also, the case of Luke v. Lyde, 2 Burrows, 883, and Baillie v. Mogdiliani, Marsh. Ins. It does not clearly appear whether in this case the crew aided in saving the goods, though it seems probable that they did. If freight was earned, and the seamen staid by the vessel and assisted in saving the ship and cargo, it would be difficult to maintain, consistently with the marine law, that wages were not due. In Post v. Robertson, 1 Johns. 24, the court seems to be of the opinion that freight was due in a case nearly resembling the present. The ship was abandoned by the crew, who were taken off the wreck by another vessel, part of whose crew brought the wreck in. The court decided that freight could not be recovered in an action on the charter-party, but a nonsuit was entered against the plaintiff, on the ground that he might prevail in a different form of action. This case would carry greater authority, if it did not appear to be very much qualified, at least, if not reversed in substance, by a subsequent decision of the same court. In Dunnett v. Tomhagen, 3 Johns. 154, where the vessel was abandoned, and part of the merchandise taken into the long-boat by the crew, who were taken up and brought in by another vessel, the court decided that no wages were due, and the reason given is that no freight was earned. The salvor, says Chief Justice Kent, in giving the opinion of the court, and not the ship-owner, was the deliverer.

It was admitted in the argument for the petitioners, that the cases in the books are at best equivocal; but it is contended that this is a question to be decided by the marine law, which, according to Lord Mansfield, is not the law of any particular state, non alia lex Romae, alia Athenis; but it is founded on principles received in common by the whole commercial world. The courts of this country apparently admit the correctness of this observation, and foreign jurists and ordinances are familiarly quoted, not as binding of their own authority on the judicial conscience of the court, but as credible witnesses to prove what the marine law is. I have looked into the foreign authorities referred to, but without finding the satisfaction in this case, which our domestic authors have failed to afford. By the civil law, the principles of which form the substratum of the marine law, what any one saved from shipwreck he saved for himself, tanquam ex incendio. By the Consolato del Mare, 492, goods saved from shipwreck shall pay freight in proportion to the part of the voyage performed. Though wages are not named in this article, the fair inference from the general tenor of that code, which studiously connects freight and wages, is, that they would be holden to be due in a like proportion. This inference is strengthened by the provisions of the other ancient ordinances.

The Laws of Oleron, art. 3, and of Wisbuy, art. 15, allow wages in case of shipwreck unless all is lost; but both ordinances make wages to depend on the services of the crew in saving the wreck. In the revised edition of the Ordinances of the Hanseatic Towns, of 1614, tit. 9, it is expressly enacted that full wages shall be paid without deduction, if enough is saved from the wreck of the vessel to pay them. The terms of the law are large enough to comprehend the present case, but in practice they were probably restrained to cases where the crew were the salvors. The rule established by the Ordinances of the Marine of Louis XIV., bk. 3, tit. 4, arts. 3-9, is, that in cases of a total loss of the ship and merchandise, the seamen lose their wages. But if any part of the wreck is saved, they shall be paid their wages, says the ordinance, from the wreck which they have saved, and an additional compensation for their labor in saving it, evidently restricting the rule to cases where the crew are the salvors. If the value of the wreck is sufficient, wages shall be paid without deduction, but if merchandise only is saved, they shall be paid in proportion to the freight received by the master. The Code de Commerce, 258-261, is substantially a transcript of the ordinance.

The language of the ordinance, that the crew shall be paid their wages, sur les debris qu'ils ont sauvè, naturally suggests the conclusion that the payment is to be made only in those cases in which they are the salvors, or at least have aided in the salvage. But Valin has expressed a different opinion. He says that in case of shipwreck the crew are at liberty to abandon the vessel, although he admits Laws of Oleron, art. 3, and the Ordinance of the Hanse Towns, art. 44, decide the contrary. His reasoning is, that by shipwreck the contract is dissolved, having been rendered impossible to be performed, by an accident of major force. The owners are under no personal obligation to pay the crew either their wages or their expenses home, and consequently they have no just cause of complaint if the seamen refuse to exert themselves in saving the wreck. The seamen are not bound to render any further service, because the contract, and with it all the obligations resulting from it, has been dissolved by an accident which renders the performance of it impossible. But though the seamen are discharged from the obligation of rendering any further service, their lien or privilege continues in force against the vessel or wreck; by whatever means it may be saved. The reason is, that the ship being specially pledged for their wages, by a general hypothecation, the lien adheres to the thing as long as it exists. His language is: "It may perhaps be said that it would be just, with regard to the seamen who refuse to labor in the salvage, to withhold from them the payment of their wages from the savings of the wreck and

freight. But this would require a law which should expressly decide it, because their wages are due from the objects which are specially pledged for them, whether they have concurred in saving them or not. When saved, they are saved for their benefit, as well as for the benefit of all others who are interested in them, whether present or absent." Volume 2, p. 704. I have not the presumption to question the authority of Valin in the interpretation of the ordinance. His commentary, by the common consent of the learned, is allowed an authority nearly if not quite equal to that of the text of the law itself. But his reasoning on this point has not been received as wholly satisfactory by all the learned among his own countrymen. Boulay Paty, one of the best commentators on the maritime part of Code de Commerce, is of the opinion that, neither under the ordinance nor the code, which here adopts the words of the ordinance, can the seamen claim wages from the savings from the wreck, unless they have contributed to the salvage; and he quotes Boucher and Delvincourt as holding the same doctrine in opposition to the authority of Valin. 2 Cours de Droit Maritime, p. 228, tit. 5, § 4.

But however it may be under the positive text of the French law, I take it to be clear by the law as it is held in this country, that the seamen are not discharged from the obligation of their contract by the happening of any fatal disaster to the vessel, but that it is their duty, while they can do it with safety, to remain by the wreck and exert themselves to the utmost of their ability to save as much as possible, both of the ship and cargo. Abb. Shipp. pt. 4, c. 2, § 6. Whatever they save, both the fragments of the vessel and the freight, constitutes a fund pledged for payment of their wages, and the foreign ordinances also allow them a further reward in the nature of salvage. Laws of Oleron, art. 3; Ordinance of Philip II. of 1563, tit. 4, § 12; Laws Hanse Towns 1591, art. 44; Ordinance 1614, tit. 4, art. 29; Jus Navale Rhodiorum, 45. Their right to wages and lien on the vessel remains as long as they remain by the wreck. But when they abandon the vessel, they at the same time abandon their claim to wages. This is the legitimate inference from that rule of policy of the marine law which connects the interest of the crew with the safety of the ship.

There is not that precision and exactness in the language of the authorities which could be desired, and in some of them, taking the terms in their ordinary import, they are comprehensive enough to include this case. But the general current of the authorities which allow wages from the savings of a wreck, is confined to cases where the crew are the salvors, or at least aided in the salvage. Where the language is general and indefinite, as that, for instance, of Judge Winchester in note to Relf v. The

Maria [Case No. 11,692], it is to be taken, I think, with this restriction. I do not find a single case that can be considered as a clear authority to sustain a claim for wages after a shipwreck and abandonment, and a salvage by others than the crew, unless that in 1 Johns. 24, be so considered, and the authority of that is much impaired by the subsequent case in the third volume of the same reporter. The silence of the books alone may be considered as an argument against the validity of the claim; for if, in any instance, it had been allowed to prevail, it probably would not have escaped the vigilance of the reporters. The result of this opinion is, that the petition must be dismissed, but it is dismissed without costs.