## THE ELIZA LINES.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 12. Argued April 11, 12, 13, 1905.—Decided October 30; 1895.

A vessel bound on a voyage from Pensacola to Montevideo with a cargo of lumber under a charter party, "the dangers of the seas, fire and navigation always mutually excepted" was abandoned, justifiably, in consequence of dangers of the seas and was afterwards picked up by salvors and brought into Boston. The master who was at St. John was notified and claimed the vessel and cargo from the salvors, stating his intention to repair the vessel and complete the voyage, to which cargo-owners objected claiming that the voyage was abandoned and they were entitled to the cargo and obtained an order for its sale. The Circuit Court held that the master should have been allowed to complete the voyage and earn freight and charged the cargo-owners personally with the net freight. *Held* error, and that the abandonment of the vessel by the master and crew gave the cargo-owners the right to refuse to go on with the voyage and that they were not to be treated as guilty of breach of contract for preventing the continuance of the voyage by their refusing to do so and procuring the sale.

An open cessation of performance with the intent to do no more, even if justified, excuses the other party from further performance on his side.

The same principles which apply to the making of a contract apply to the breach of it, and to nonperformance of the conditions attached to the other side.

If there is no injustice it is desirable that the maritime law of this country and of England should agree.

THE facts are stated in the opinion of the court.

*Mr. L. S. Dabney,* with whom *Mr. F. Cunningham* was on the brief, for Ward & Co., cargo-owners:

When a vessel has been abandoned at sea by the master and crew without any intention of returning to her, the owner of cargo has the right, before the carrier or his agents have regained possession of the cargo, to treat the contract of affreightment as abandoned and at an end, and to receive his cargo without becoming liable for any freight; and this although the abandoned ship and cargo are carried by salvors to the original port of destination. *The Arno,* 8 Asp. Mar. Law Cas. 5 (1895); *S. C.,* 72 L. T. (N. S.) 621; *The Cito,* L. R. 7 P. D. 5 (1881); *The Kathleen,* L. R. 4 Ad. & Ecc. 269, 1874; *The Leptir,* 5 Asp. Mar. Law Cas. 411, 1885; *S. C.,* 52 L. T. (N. S.) 768; *The Argonaut,* Shipping Gaz., Dec. 5, 1884, 775; *The Elizabeth and Jane,* 1 Ware, 41, 1823; *S. C.,* 15 Γ d. Cas. 478, Case No. 8,321; *The Mansanito,* 22 Fed. Cas. 594, Case No. 13,075, 1861; *The James Martin,* 88 Fed. Rep. 649, 1883; *Dunnett* v. *Tomhagen,* 3 Johns. 154, 1808; *Post* v. *Robertson,* 1 Johns. 24, 1806.

After the renunciation of a continuing agreement by one party, the other party is at liberty to consider himself absolved from any further performance of it, retaining his right to sue for damages sustained. *Roehm* v. *Horst,* 178 U. S. 1.

The carrier is not bound to resume the voyage.

The carrier is not bound to stipulate for the cargo or even for his own ship. He can without any breach of contract leave the salvage proceedings to take their course and let his ship be sold to pay the salvage. *The Nathaniel Hooper,* 3 Sumn. 542.

The owner of cargo may stipulate for his cargo but he has no right to stipulate for the ship. If he find her derelict upon the high seas with his cargo on board, he has no right to take possession of her except as a salvor: certainly not for the purpose of completing the carriage of his cargo. *The Arno, supra.*

The voyage of the Eliza Lines could not after the abandon-

ment by the master and crew be resumed, as concerns the cargo-owner, with the same character of a transaction of commerce.

As Ward & Co: had exercised the right to treat the contract of affreightment as at an end, and to receive their cargo, or to have it sold, without the payment of any freight, it follows that they are not liable personally and that no decree can properly be made against them personally. They are not liable upon any express contract and can be liable only upon an implied contract, to pay for benefits received by services rendered or to sacrifices made to save their cargo. *Flaherty* v. *Doane*, 1 Lowell 148.

The bottomry bondholder, of course, had no personal claim against Ward & Co. and the decree against Ward & Co. for bottomry must rest wholly upon the consolidation of the causes, and convenience in the distribution of the amount awarded against them.

One of the best established and beneficent powers of the Admiralty Court has always been that of ordering a sale upon the happening of a maritime disaster, after hearing all persons concerned. This power has been exercised for the very purpose of settling the question of the necessity and taking the responsibility from the shoulders of any one interested in the adventure; and while it is oftenest invoked by the master in order to relieve himself from responsibility, as for instance in selling cargo to obtain funds to carry on the voyage, it may be invoked by a cargo-owner or by any one else who is interested. 2 Parsons on Ship. 338; Benedict's Adm. Prac., 3d ed., § 299; *The Fanny & Elmira*, Edward's Adm. Rep. 117; *The Gettysburg*, 5 Asp. Mar. Law Cas. 347; *Janney* v. *Columbian Ins. Co.*, 10 Wheaton, 411, 418; *Dorr* v. *Pacific Ins. Co.*, 7 Wheaton, 581; Dunlap's Adm. Prac. p. 64.

When the master sells upon a marine disaster, even without any legal proceedings, if it be done *bona fide* for the benefit of all concerned, the sale is upheld as against all persons, even though as a matter of fact it turns out to have been unfortunate. *The Amelie*, 6 Wall. 18; *Post* v. *Jones*, 19 How. 150.

Yet in this case, when a sale has been made in a port of refuge by order of an admiralty court upon due proceedings, and after hearing all persons interested, the Circuit Court rules that it must be assumed to have been made, unless the cargo is technically perishable, in the interest of the party moving it, and that that party is liable for the consequences of it.

The grounds for the motion for a sale were well known and valid grounds, and grounds on which the courts have frequently ordered sales. There is no absolute right in case of salvage to a delivery of the property on stipulation. *300 Tons of Iron Ore*, 38 Fed. Rep. 36; *The Nathaniel Hooper*, 3 Sumn. 542, 562; *The Mendota*, 14 Fed. Rep. 358; *The Kathleen*, L. R. 4 Ad. & Ecc. 269; *The Lion*, 1 Sprague, 399.

In proceedings *in rem* the allowance of process is the act of the law, so that no damages are allowed for the arrest and detention of a vessel, unless there is bad faith or deceit practiced in suing out the warrant, or the suit is one that may be characterized as a malicious prosecution. *The Alex Gibson*, 44 Fed. Rep. 371, 374; *The Adolph*, 5 Fed. Rep. 114; *Kemp* v. *Brown*, 43 Fed. Rep. 391; *The Wasco*, 53 Fed. Rep. 546; Henry Adm. p. 337. Where a sale *pendente lite* is fairly made upon a valid order of the court, to prevent the property being eaten up by charges, it protects all parties equally with the purchaser. *Pollard* v. *Baker*, 101 Massachusetts, 259; *American Ins. Co.* v. *Johnson*, 1 Blatchf. & H. 9; Kleber on Judicial Sales, § 2, p. 58 and cases cited.

*Mr. John Lowell* and *Mr. James A. Lowell* for Andreasen, master.

*Mr. Harrington Putnam* and *Mr. Edward S. Dodge*, with whom *Mr. Frederic Dodge* was on the brief, for the salvors and holders of bottomry bond:

In England when a vessel abandoned by the ship-owner owing to stress of weather is brought into harbor by salvors, the cargo-owner may elect to treat the contract of affreightment as at an end if the vessel has not come into the possession

of the ship-owner again. *The Kathleen*, 2 Asp. M. C. 367; *The Cito*, 4 Asp. M. C. 468; *The Argonaut*, Shipping Gazette, 1884, 775; *The Leptir*, 5 Asp M. C. 411; *The Arno*, 8 Asp. M. C. 5. The injustice of this rule is obvious. Saunders, Maritime Law, p. 133. The ship-owner has not been at fault, as his abandonment of the vessel was caused by the excepted peril of the seas; but he must deliver up the goods without receiving freight, if the cargo-owner so desires, or he may be compelled to carry them on. The English cases do not rest on a sound basis. They overlook the true nature of a contract of carriage. In such a contract the ship-owner agrees to carry the goods to their destination; the cargo-owner agrees to pay the freight when the goods arrive. *Hunter* v. *Prinsep*, 10 East, 378, 394; *The Arno*, 8 Asp. M. C. 5, 6; *Ellis* v. *Willard*, 9 N. Y. 529, 532; *The Tornado*, 108 U. S. 342; and under this contract the perils of the sea are excepted. The law of carriage by sea rests on the basis of this simple contract. The ship-owner has the right to carry the cargo and the cargo-owner has the right to have it carried. The ship-owner may carry to the destination, *Allen* v. *Mercantile Ins. Co.*, 44 N. Y. 437; the cargo-owner cannot get the goods at an intermediate port except by paying full freight. Schouler Bailments, 3d ed., sec. 528; 2 Parsons Contracts, 9th ed., p. 425; *The Teutonia*, 1 Asp. M. C. 32; *Palmer* v. *Lorillard*, 16 Johns. 348, 355; *The Nathaniel Hooper*, 3 Sumner, 542, 555; unless they are voluntarily given up for a less amount. 2 Parsons Contracts, 9th ed. p. 427; *Smyth* v. *Wright*, 15 Barb. 51; *McKibbin* v. *Peck*, 39 N. Y. 262; *Hunt* v. *Haskell*, 24 Maine, 339. The ship-owner has the right to complete the carriage and may have a reasonable time in which to repair his injured vessel or he may trans-ship and send the goods on in another vessel. *Shipton* v. *Thornton*, 9 A. & E. 314; *The Soblomsten*, L. R. 1 A. & E. 293; *McGaw* v. *Ocean Ins. Co.*, 23 Pick. 405; *Harrison* v. *Fortlage*, 161 U. S. 57, 65.

Ordinarily the ship-owner keeps possession of the goods during carriage, but possession in him is not essential. He may forward the cargo in a vessel belonging to someone else if

his vessel is injured, *Shipton* v. *Thornton*, 9 A. & E. 314; and he is entitled to freight though the voyage be only partly performed by himself and completed by salvors or insurers. *Hubbell* v. *Great Western Ins. Co.*, 74 N. Y. 246; *Hughes* v. *Sun Mutual Ins. Co.*, 12 Daly, 45; S. C. 100 N. Y. 58.

Capture by an enemy does not put an end to the right to freight, which is only suspended and revests in the ship-owner on recapture. Carver, Carriage by Sea, 3d ed., p. 274; *The Copenhagen*, 1 Rob. 289; *Spafford* v. *Dodge*, 14 Massachusetts, 65.

If the cargo-owner forcibly takes possession of the goods the right to freight is not thereby lost. *Braithwaite* v. *Power*, 1 N. Dak. 455.

The question of possession therefore is not one of the important things to be considered as the rights of the parties to a contract of carriage do not depend on it.

When Andreasen left the bark he had no thought of completing the voyage, but his thoughts not communicated to the cargo-owner had no effect on the relations between the parties and there was no absolute remuneration. *Palmer* v. *Lorillard*, 16 Johns. 348, 357. He had the right to carry the lumber to Montevideo. He never gave up this right. His excusable abandonment of the vessel was not a breach of the contract because it was a thing mutually expected and expressly allowed for. *Cargo of the Bark Luteken*, 6 Ben. 565, 569; *Ellis* v. *Willard*, 9 N. Y. 529; *Roehm* v. *Horst*, 178 U. S. 1, distinguished.

When the master rejoined his vessel the situation was the same as if he had not been obliged to abandon her but had put into a port of necessity. The question was whether he could repair his ship within a reasonable time and complete the voyage. He could do so and he was bound to do so. If he had refused so to do he could not have recovered any freight at all. 2 Parsons Contracts, 9th ed., p. 427; *Hunter* v. *Prinsep*, 10 East, 378, 394; *Portland Bank* v. *Stubbs*, 6 Massachusetts, 422; *Adams* v. *Haught*, 14 Texas, 243; *Welch* v. *Hicks*, 6 Cowen, 504; but would have been liable in damages for breach of the con-

tract of carriage.    *Hill* v. *Wilson*, 4 C. P. D. 329; *Assicurazioni Generali* v. *S. S. Bessie Morris Co.* (1892), 1 Q. B. 571.

The master was entitled to full freight without deductions. Ward & Co. are not entitled to any credits.

The question is, not what amount Andreasen has lost but what the liability of Ward & Co. is for having seized the goods. In cases where the injured party is insured it is no defense to the wrong doer that the insurance has been paid. *Clark* v. *Wilson*, 103 Massachusetts, 219; *Chicago Co.* v. *Pullman Co.*, 139 U. S. 79.

Here the same rules should apply as have always been laid down in cases where the voyage was prevented by the cargo-owners. *Shipton* v. *Thornton*, 9 A. & E. 314, 335; *Cargo ex Galam*, Br. & Lush., 167; *The Soblomsten*, L. R. 1 A. & E. 293; *The Nathaniel Hooper*, 3 Sumner, 542, 555. The voyage was prevented by Ward & Co. and they are, therefore, liable to the same extent as other cargo-owners who have broken up a voyage which the ship-owner was willing to carry on.

Mr. JUSTICE HOLMES delivered the opinion of the court.

This case comes here by certiorari to the Circuit Court of Appeals. The decree in that court was made in a cause in which were consolidated four suits: A libel for salvage against the Eliza Lines, her cargo and freight; a libel for possession by the cargo-owners against the cargo; a libel by the master against cargo and cargo-owners for freight and general average, and a libel by a bottomry lender against the vessel and freight. The Eliza Lines, a Norwegian bark, was bound on a voyage from Pensacola to Montevideo with a cargo of lumber, under a charter party, "the dangers of the seas, fire and navigation always mutually excepted." It was abandoned, justifiably, in consequence of dangers of the seas, and was afterwards picked up by salvors and brought into Boston on September 19, 1889. The master was notified by the owners and came on from St. John, New Brunswick, arriving on September 21. The cargo-owners

(Ward & Co.) and the master both demanded possession of the cargo from the salvors, but the salvors retained possession and filed their libel for salvage on September 26. The next day the master filed a claim for ship and cargo and within an hour Ward & Co. filed their claim for the cargo as above mentioned. On October 5 the vessel was delivered to the master, and on October 18 the master moved for a delivery of the cargo to him upon stipulation in order to resume his voyage, while Ward & Co. moved that the cargo be sold on the ground that its value was rapidly diminishing by reason of charges and costs. The former motion was denied and the latter granted on November 16. On November 27 the master filed his libel for freight and general average. The Circuit Court, reversing the decision of the District Court, held that the master should have been allowed to complete the voyage and earn freight, and charged the cargo-owners personally with the net freight that would have been earned, with other particulars not necessary to mention. 61 Fed. Rep. 308; 102 Fed. Rep. 184. The decree was affirmed with a slight variation by the Circuit Court of Appeals. 114 Fed. Rep. 307.

The question is whether the abandonment of the vessel by the master and crew gave the cargo-owners a right to refuse to go on with the voyage in the circumstances disclosed; in other words, whether the cargo-owners properly were treated as guilty of a breach of contract for preventing the continuance of the voyage by their refusal and by procuring a sale. It will be noticed that the decree must stand on the ground that the contract was broken by the cargo-owners and that the ship-owners were entitled to recover under it, although the voyage was not completed. The decree was not upon a new contract such as it was attempted to set up in *Hopper* v. *Burness*, 1 C. P. D. 137, or upon the analogy of a *quantum meruit* at common law, which was expressly disavowed. The very foundation of a recovery upon the latter ground is that the express contract is out of the way, but that a benefit has been received which ought to be paid for. Therefore, in such a case the recovery cannot exceed

the benefit, as often has been explained in the books. *Gillis* v. *Cobe*, 177 Massachusetts, 584; Keener, Quasi-Contracts, Ch. 4. See *Flaherty* v. *Doane*, 1 Lowell, 148, 150. In the case at bar, while the District Court allowed freight pro rata as a charge on the proceeds of the cargo, the Circuit Court of Appeals held the cargo-owners personally for a sum much exceeding that amount, and therefore much exceeding the benefit actually received. It will not be necessary to consider the decree of the District Court, since that was not appealed from by the cargo-owners, and we shall not discuss the effect of the judicial sale, as it is not necessary in the view which we take.

: There is no doubt that the English decisions confidently assert the cargo-owners' right to refuse to go on. They may be read in the reports, and there is no need to do more than to refer to them. *The Arno*, 8 Asp. Mar. Cas. 5; *The Leptir*, 5 Asp. Mar. Cas. 411; *The Argonaut*, Shipping Gazette, Weekly Summary, Dec. 5, 1884, p. 775; *The Cito*, 7 P. D. 5; *The Kathleen*, L. R. 4 Ad. & Ec. 269. The only point which they leave open is whether, if the master should get the abandoned vessel and cargo back from the salvors before the cargo-owners had declared an election to end the contract, he might in that way revive his right to finish the voyage. On that point it is enough to say here that if the English rule is right, then, even if there is any such qualification to it, the exception must depend upon something more substantial than a few minutes' priority in filing a libel, when neither master nor cargo-owner has possession either of cargo or ship, as, plainly, neither had in this case.

The right of cargo-owners to treat the contract as ended by the abandonment of the ship was asserted much earlier than the English cases by Judge Ware in *The Elizabeth and Jane*, 1 Ware, 41, *S. C.* 15 Fed. Cas. 478, Case No. 8321, and earlier still by Mr. Story before he became a justice of this Court, in his edition of Abbott on Shipping (1810), pp. 338, 512, citing *Dunnett* v. *Tomhagen*, 3 Johns. 154, and *Mason* v. *Ship Blaireau*, 2 Cranch, 240. We see nothing in *The Nathaniel Hooper*, 3 Sumner, 542, suffi-

cient to prove that he changed his opinion.   That case is cited
in 3 Kent Comm., 13th ed. 228, along with *Post* v. *Robertson*,
1 Johns. 24, in which and in *Dunnett* v. *Tomhagen, supra,* the
Supreme Court of New York and Chief Justice Kent took the
same general view, subject to the question whether there might
be a recovery on a *quantum meruit* when benefits were accepted
under the contract, in spite of a failure of complete performance.
See *Caze* v. *Baltimore Ins. Co.,* 7 Cranch, 358, 362.   3 Kent
Comm. 229.   Other cases are *The Mansanito,* 22 Fed. Cas: 594,
No. 13,075.   *The James Martin,* 88 Fed. Rep. 649.   See also 3
Kent Comm. 196.   In short, we are aware of no decision in
this country or in England before the present case which casts
any doubt upon the rule.

It was thought by the Circuit Court and Circuit Court of Ap-
peals that the doctrine so unanimously sanctioned by so many
of the most eminent judges of this country and of England is
unjust, and the case was put of a long voyage nearly completed
and the ship and cargo subsequently brought by salvors intact
to the port of destination.   But we are of opinion that there is
no injustice in holding that what excuses the ship excuses the
cargo, and that the rule is in accord with the general principles
of contract.   Subject to the question whether the cargo-owners
broke their contract, it seems to us more unjust to charge them
personally, in favor of those who failed to complete the voyage
as contemplated, with a sum much exceeding the benefit which
the cargo-owners received from what was done.   Of course it is
desirable, if there is no injustice, that the maritime law of this
country and of England should agree.

To begin at a distance, a repudiation of a contract, amount-
ing to a breach, warrants the other party in going no further in
performance on his side.   *Roehm* v. *Horst,* 178 U. S. 1.   But
the same thing is true of an absolute repudiation not amount-
ing to a breach.   *Frost* v. *Knight,* L. R. 7 Ex. 111, 113; *Phill-
potts* v. *Evans,* 5 M. & W. 475, 477; *Ballou* v. *Billings,* 136
Massachusetts, 307, 309.

It appears to us and we shall try to prove that an abandon-

ment of the ship must be regarded as a renunciation of the contract, even if not a repudiation of its terms as binding. It is an overt act which is more than an attempt to give up the voyage. It not merely makes the completion of the voyage so improbable, by reason of the helplessness in which the ship is left and the intent with which the act is done, as practically to destroy the value of the contract to the cargo-owner, see *Swift and Company* v. *United States*, 196 U. S. 375, 396, it is a present failure to do what the contract requires, if the purposes of the contract are to be carried out. The requirement is shown by the fact that the abandonment would be a cause of action unless justified. It not only would be a breach of contract but no one questions that it would authorize a rescission of the contract on the other side, which not every breach of contract does. That it would authorize rescission or refusal to allow the master to change his mind if the vessel was saved shows that a continuous intent and effort to go on with the voyage is an essential condition to the obligation to pay freight. It shows, what needs no illustration, that the continuous care of the master is the main object of the cargo-owners' interest in the contract. By the general principles of contract an open cessation of performance with the intent to do no more, even if justified, excuses the other party from further performance on his side. The principle is not peculiar to charter parties, it is illustrated in other parts of the law. See *Roehm* v. *Horst*, 178 U. S. 1.

In the case at bar the vessel was abandoned with the intent not to return to her or to complete the voyage. This is admitted, if admission be necessary, by the testimony of the master. Of course it is not disputed that the completion of the voyage and delivery of the cargo are absolute conditions to the undertaking to pay freight, by the express terms of the contract and the familiar rule of law. 3 Kent Comm. 220, 228. The master left ship and cargo to their fate, and we cannot doubt, although it was denied, that, after he had done so, if the cargo-owners had been the salvors they could have treated the voyage as at an end. The ground must be that the abandon-

ment was more than an attempt, or a mere offer of rescission which might be revoked by the master before acceptance, and that it was an unequivocal departure from the conditions which the contract imposed. If the abandonment had been unjustified and a breach of contract, of course it would not have ended the contract, but would have left the choice whether to end it or not to the cargo-owner. If justified, the simplest view would be that it was so because the contract authorized the master to end it when prevented from performance by perils of the sea, and that the contract was ended. But at all events, as control of the ship and voyage was given up and never regained, the abandonment at least gave an irrevocable power to the cargo-owners to decline to be further bound. See, in addition to cases cited above, 3 Kent Comm. 196. The opposite view must be that the master still is bound to go on with the voyage notwithstanding his justifiable abandonment, if a chance should turn up, a view which leaves his duties in a very ambiguous shape, or else that the master has the choice, which gives the election to the party whose act has made the trouble, as against the party that has done nothing and has had nothing to say.

If it be true that if, on the other hand, the master had rejoined the ship before any one else had taken possession, or had got it back from the salvors before the cargo-owners had been heard from, he might have had a right to complete the voyage, the ground must be that the law would not insist on a technical breach of condition when there had been no substantial change of circumstances and no harm done.

The argument on the other side consists largely in the attempt to treat leaving the ship under stress of perils of the sea as not distinguishable on principle from being torn bodily away from it by tempest. This is one of the oldest fallacies of the law. The difference between the two is the difference between an act and no act. The distinction is well settled in the parallel instance of duress by threats, as distinguished from overmastering physical force applied to a man's body and imparting to it the motion sought to be attributed to him. In the former case

there is a choice and therefore an act, no less when the motive commonly is recognized as very strong or even generally overpowering, than when it is one which would affect the particular person only, and not the public at large. It has been held on this ground that duress created by fear of immediate death did not excuse a trespass. *Gilbert* v. *Stone*, Aleyn, 35; *S. C.* Style, 72; *Scott* v. *Shepherd*, 2 W. Bl. 892, 894. See *Miller* v. *Horton*, 152 Massachusetts, 540, 547. It has been held that a similar plea in the case of shipwrecked men at sea did not prevent the killing of one of them from being murder. *Queen* v. *Dudley*, 14 Q. B. D. 273. See *United States* v. *Holmes*, 1 Wall. Jr. 1. It is clear that a contract induced by such fear is voidable only, not void, and that the ground of avoidance being like fraud, that the party has been subjected to an improper motive for action, when that motive has been created by a stranger and is unknown to the party the contract stands. Keilwey, 154a, pl. 3. *Fairbanks* v. *Snow*, 145 Massachusetts, 153. So a conveyance induced by duress is operative until avoided and cannot be set aside when the property has passed to a purchaser without notice. *Bainbrigge* v. *Browne*, 18 Ch. D. 188, 197; 2 Williams, Vendor & Purch. 767; *Clark* v. *Pease*, 41 N. H. 414. The distinction is as old as the Roman law, *Tamen coactus volui.* D. 4. 2. 21 § 5. 1 Windscheid, Pandekten, § 80.

The same principles which apply to the making of a contract apply to the breach of it and to non-performance of the conditions attached to performance on the other side. The contract before us by construction provides that an abandonment of the voyage in consequence of the perils of the sea shall not be an actionable breach, but it equally provides that a completion of the voyage shall be an absolute condition to the right to freight. The same absoluteness attaches the further condition implied from the first that the effort to complete the voyage shall not be given up voluntarily, midway.

The argument urged to the effect that the cargo's liability to general average created a right to have the voyage finished, however it might have been otherwise, does not need an ex-

tended answer.  The cargo-owners had the same right to treat
the contract as ended as against a ship-owner who had cut down
a mast that they would have had against one who had made no
sacrifice for the common good.  The contract is the supreme
source of mutual rights, and cannot be overridden by the inci-
dents of its performance.

The case was brought here by the cargo-owners to get rid, if
possible, of the personal liability imposed by the Circuit Court.
As this court is of opinion that the personal liability should not
have been imposed, no other question needs consideration here.

*Decree reversed.*

MR. JUSTICE BROWN, with whom were MR. JUSTICE HARLAN,
MR. JUSTICE McKENNA and MR. JUSTICE DAY, dissenting.

Underlying all the questions connected with the libel of Ward
& Co. for the possession of the cargo, and that of Andreasen in
the nature of a cross libel against the cargo *in rem,* and against
Ward & Co. *in personam* for freight, is the proposition that the
abandonment of the vessel by the master and crew operated as
a dissolution of the contract of affreightment and authorized
Ward & Co. to reclaim possession of the cargo, either freed alto-
gether from any claim for freight, or upon the payment of a
*pro rata* freight to Boston.

The general principles applicable to a contract of affreight-
ment are entirely well settled, but it may not be amiss to restate
such of them as bear upon the effect of an abandonment at sea,
and subsequent rescue of the vessel.  The contract is an entire
one, and cannot be apportioned, unless by consent of the parties.
*The Nathaniel Hooper,* 3 Sumner, 542, 554; *Hunter v. Prinsep,*
10 East, 378, 394; *Post v. Robertson,* 1 Johns. 24, 26.  From the
moment the cargo is delivered to the vessel, each is bound to the
other for the performance of the contract.  The shipper cannot
recover his cargo except upon the payment of full freight.  *Tin-
dall v. Taylor,* 4 Ellis & Bl. 219.  Neither can the vessel demand
any portion of the freight until the cargo is delivered at the port

of destination.   If the vessel meet with disaster at sea and put into a port of refuge, she is entitled to retain the cargo for a reasonable time for repairs, or to trans-ship it to another vessel, in order that her freight may be earned.   *The Soblomsten*, L. R. 1. Ad. & Ec. 293; 1 Pars. on Ship. 175, 231; *Cargo ex Galam*, Br. & L. 167, 178.   If, however, the master of the vessel is willing to surrender the cargo at an intermediate port, and the shipper is willing to receive it, he may do so upon payment of a *pro rata* freight.   In other words, the parties may substitute a new contract for the original one.   Neither party, however, can be compelled to this course.   *Post* v. *Robertson*, 1 Johns. 24, 27.

If it be once granted that, in case of shipwreck or other disaster, the contract of affreightment is not dissolved, and the authorities on this question, both in this country and in England, settle this beyond controversy, *Cargo ex Galam*, Br. & L. 167; *Shipton* v. *Thornton*, 9 Ad. & Ellis, 314, it is difficult to see why, on principle, a compulsory abandonment at sea should work a different result, provided the vessel be ultimately rescued and taken into port.   The abandonment is but a feature of the disaster, and is no abandonment at all of the ship and cargo in the sense in which that word is used in the law of marine insurance, where a vessel after such disaster is abandoned to the underwriters.   *Thornely* v. *Hebson*, 2 B. & Ald. 513, 519.   In such case the abandonment is a voluntary and complete surrender of the ship and cargo, and of all right, title and interest thereto, and the underwriter becomes the owner with all the rights and liabilities incident to such ownership.   It is true it has been held that the underwriter may decline to accept such abandonment and may repair the vessel and return it to the owner, but that does not change the character of the abandonment.

The same may be said of the throwing overboard of portions of a cargo of perishable articles, on account of rottenness, putrescence or threatened danger to the rest of the cargo.   But the case under consideration is more nearly analogous to the jettison of valuable cargo for the purpose of relieving the ship or preventing her from drifting ashore.   This has never been

supposed to work any change in the ownership or an abandonment of the property, although it may subject it to the claim of salvors, who may subsequently rescue it. *The Kathleen,* L. R. 4 Ad. & Ec. 269, 278. The abandonment of the ship and cargo in this case did not operate as a transfer of the property to any one who should rescue it, but was an involuntary abandonment of the voyage, a relinquishment of any present intention to continue it, and a flight from the vessel to save the lives of the crew, and for the purpose of obtaining a supply of fresh water. If the abandonment have the effect claimed for it, of dissolving the contract of affreightment, logically it would have that effect from the moment the master and crew were transferred to the schooner which took them off; but it will not be doubted that, if within an hour, a steam tug had hove in sight and offered to take the abandoned vessel in tow, the rights of the master and owner would have remained unimpaired, except for the claim for salvage. In our view it would make no difference whether the master had hired a steam tug to tow her to a place of safety, or whether, after the master and crew had left her, a vessel had come along, picked her up and towed or navigated her to a harbor of refuge. Granting that the master and crew left her with no intention of returning, such intention was caused by the belief on his part that she was a total loss. But if the circumstances were so changed that she did not become such, we see no reason why he was not entitled to change his mind in that particular, provided that he acted with sufficient promptness, and intervening rights had not accrued.

The facts of this case show that as soon as the master learned of the rescue of the vessel he went to Boston, arriving September 21, two days after the barque, went aboard the vessel, announced his intention of completing the voyage, and, the day after the libel for salvage was filed, interposed a claim for ship and cargo, in which he alleged that he was entitled to the possession of the cargo of hard pine lumber then on board of her, having given bills of lading for it, and being obliged by the terms of such bills of lading to deliver said cargo at Montevideo

199 U. S. BROWN, HARLAN, McKENNA and DAY, JJ., dissenting.

in the province of Uruguay. There was manifestly no lack of diligence here, although the agents of Ward & Co. filed a claim to the cargo later on the same day, and on October 18 filed a libel for possession and moved for a sale of the cargo. The question was thus squarely presented as to which of these parties was entitled to the cargo, which was manifestly dependent upon the other question, whether the contract of affreightment was still in existence. That there was no definite intention of abandoning the lien of the ship upon the cargo is shown by the fact that as soon as the master was informed that the vessel had been rescued he took immediate steps to recover possession of the cargo.

The American cases upon the effect of abandonment of a vessel at sea upon the contract of affreightment are not of any great value, as the subject is not fully discussed in any of them and the question was not presented in the aspect in which it is before us in this case. In the *Elizabeth and Jane*, 1 Ware, 41, the petition was for wages, which were denied upon the ground that the vessel had been abandoned and no freight had been earned. The case of *The Nathaniel Hooper*, 3 Sumner, 542, is still more indefinite in its treatment of the subject herein involved. So, in the case of *Dunnett* v. *Tomhagen*, 3 Johnson, 154, wages were denied to the seamen, because no freight was earned on the homeward voyage, no part of the cargo being delivered by the ship.

In *Post* v. *Robertson*, 1 Johns. 24, the vessel was abandoned after performing three-fourths of her homeward voyage, was rescued by salvors and brought into port, where the cargo was sold, and the proceeds paid to the salvors and owners. It was held that this was not such a delivery of the cargo as would entitle the ship-owners to maintain an action on the charter party for full freight. The case turned largely upon the form of action, covenant, and the court was inclined to the opinion that an action might have lain for a *quantum meruit*.

In none of these cases was the question discussed as to the power of the master to reclaim possession of the cargo at the

port of refuge in order to earn his freight, it being seemingly assumed that the wreck and abandonment of the vessel had dissolved all contracts, and especially that of the seamen, who attempted to enforce their lien upon the cargo before freight had been earned by its delivery at the port of destination.

It may be frankly admitted that the English cases lay down the rule that the abandonment of the vessel puts an end to the contract of affreightment, or at least it gives the owner of the cargo an option to do so.   The case of *The Kathleen*, L. R. 4 Ad. & Ec. 269, is the earliest upon the subject, and asserts a principle which has been followed in the subsequent English cases.   The Kathleen had left Charleston with a cargo of cotton bound for Bremen, and when in the English Channel suffered a collision with another vessel, for which the Kathleen was in nowise to blame.   On the following day she was abandoned by her crew and rescued by salvors, taken to Dover and sued for salvage.   The owner of the Kathleen applied for leave to bond the cargo in the salvage suits in order that they might carry the same to its destination.   The court ordered the cargo sold on the ground that it was deteriorating fast through the damage sustained by salt water.   A suit for freight was subsequently instituted by the owners of the vessel.   Sir Robert Phillimore held that the original contract between the owners of the ship and cargo was at an end, and that no freight was due, and in answer to the claim of *pro rata* freight observed that the title to such *pro rata* freight must arise out of a new contract with the ship-owner, to which both parties assent, and as neither party assented, *pro rata* freight was not due.   In view of the fact that at least seven-eighths of the voyage had been performed; that the collision which put an end to the voyage was not in anywise the fault of the Kathleen; that she was taken into a port in the immediate neighborhood, and that the vessel stood ready to take the cargo on to Bremen and earn her freight, we are not favorably impressed with the natural justice of a decision which denied even *pro rata* freight to the master.

The case of *The Cito*, 7 P. D. 5, was much like that of *The*

*Kathleen*, which was followed by the Court of Appeals in an opinion by Lord Justice Brett, subsequently Lord Esher. The Cito, on a voyage from Wilmington to Rotterdam, with a cargo of resin in barrels, was, owing to the peril of the sea, abandoned by her crew off the American coast. She was subsequently picked up and navigated to Plymouth, and there arrested for salvage. The court declined to hold that a mere abandonment at sea put an end to a contract of affreightment, since the abandonment might be wrongful, and in such a case the owner of the cargo might sue the ship upon its contract; but it held that the abandonment was so far binding upon the ship-owner as to allow the cargo-owner to treat such contract as abandoned. The court also held that the court below was right in ordering the cargo to be delivered to the owners upon their giving bail for salvage. Some stress was laid upon the fact that before the ship-owners sought the possession of the cargo, the cargo-owners had intervened and applied for it.

In the case of *The Leptir*, 5 Asp. M. L. C. 411, the salving vessel took off the crew of the vessel in distress, refused to allow her own crew to return, and the two vessels were navigated into a port of refuge. It was held that there was no abandonment, that the case of *The Cito* did not apply, and the court decreed for a *pro rata* freight.

In *The Argonaut*, unreported, but published in the Shipping Gazette of December 5, 1884, a vessel on a voyage from Halifax to Liverpool was abandoned by her crew and picked up by salvors off the English coast. On being taken to Plymouth the owners demanded the cargo, but the court ordered it carried to Liverpool, where it obtained a higher price than the owner could have gotten for it at Plymouth. It seems to have been carried in the ship by her own crew from Plymouth to Liverpool. The Admiralty Court allowed a *quantum meruit* freight, but its decree was reversed by the Court of Appeals, which held that the ship was entitled to nothing.

The prior cases were, however, pushed to their logical conclusion in that of *The Arno*, decided by the Court of Appeals,

8 Asp. M. L. C. 5. The vessel, while on a voyage from New York to Liverpool, was, owing to stress of weather, abandoned at sea on March 31, and three days thereafter was picked up by a salvage crew, and taken to Liverpool, her port of destination. The Admiralty Court held that, although the cargo was delivered by the vessel on which it had been originally shipped, at the port of destination, the act of abandoning her so clearly indicated the intention of the master not to carry out the contract, as to entitle the owners of the cargo to treat that act as putting an end to it. It was held that no freight was recoverable. It appeared that on April 11, as soon as the owner of the Arno heard of the abandonment, he made an arrangement with the salvors, sent a tug to meet the vessel, which returned with her to Liverpool on April 25. It was intimated that if, before notice to the ship-owner of the election of the cargo-owner to treat the contract as at an end, he had been able to resume possession of the ship and cargo, he might perhaps have been able to annul the abandonment, but not having done so, the cargo-owner had a right to treat the abandonment as a dissolution of the contract. The judgment was affirmed by the Court of Appeals. It is true that in this case the cargo was not delivered at the port of destination by the crew of the ship, but by the salvor's crew. It was, however, delivered by the ship herself, and we see no reason why the salvor's crew might not have been treated as the agent of the ship, in that particular; but the court held to the hard and fast rule of *The Cito*, that the abandonment of a ship *ipso facto* put an end to the contract of affreightment, notwithstanding the fact that the cargo was delivered by the same ship and at the port of destination. Under such circumstances the denial of all freight seems to have worked a great hardship.

Although the House of Lords has not yet spoken upon the subject, these cases must be regarded as settling the English rule that a compulsory abandonment of a vessel at sea puts an end to the contract of affreightment and disentitles her owners to recover any portion of her freight, notwithstanding that she

and her cargo may be picked up by salvors and taken into an intermediate port, or even to the port of discharge.

That the soundness of this doctrine has not been accepted without challenge is evident, not only from certain expressions by some of the English writers, but notably by Dr. Wendt, in his work on Maritime Legislation, wherein he speaks of *The Cito* as having caused much surprise among those interested in maritime commerce, and comments upon it as follows (3d edition, page 629):

"So long as this *Cito* decision stands it gives the cargo owner the full option to take advantage of the common misfortune for the purpose of evading the contract entered into by him. This, I confidently assert, is opposed to every principle of law and justice. A contract, by the law of every civilized country, holds good until both parties to it, of their own free will, agree that it shall not be carried out. Now, how can the abandonment of a ship in such a case as *The Cito* be taken to be an expression of an agreement on the part of the owners of the vessel to cancel the contract? The action of the crew in leaving a vessel to save their lives is not an act of will at all; they have to desert their vessel under the pressure of a *vis major*. How can this be taken to show an agreement on the part of the ship owner to abandon his part of the contract? He has no power to exercise any option at all. If, when the vessel is recovered and the owner again requires [acquires?] the power to exercise his will in the matter, he then elects not to carry out his contract, and the cargo owner agrees, well and good; the contract is put an end to by mutual consent. To assume, however, such consent on the part of one of the contracting parties from an action forced on his servants by a power which cannot be resisted seems to me to be a doctrine utterly opposed to common sense."

The ruling of the English courts that even a delivery of the cargo at the port of destination does not entitle the ship-owners to any freight whatever, seems a somewhat startling innovation upon the ancient rule of the Admiralty, that a loss occa-

sioned by a peril of the sea shall be borne as a common burden and shared proportionately by the ship, cargo and freight, as well as a departure from the general rule that neither party can put an end to a contract without the assent of the other.

We consider the sounder doctrine to be that the compulsory abandonment of a ship at sea should be treated merely as a relinquishment of the voyage and of any present intention to continue it, but that if the vessel be subsequently rescued and taken into an intermediate port, the master retains the same right given to him by an ordinary disaster at sea, unattended by an abandonment, to resume possession of the ship and cargo, subject, of course, to the claim of salvors, and carry the latter forward to its destination, provided he act with promptness and before any intervening rights had accrued.

The opinion of the court assumes that the abandonment of the vessel was a repudiation and a rescission of the contract of affreightment, when in fact it was involuntary, designed only to save the lives of the crew, and had as little effect upon the contract as if the vessel had met with a disaster not involving an abandonment and put into a port of safety for repairs. It apparently ignores the principle that, to constitute a rescission, there must be the same intent to rescind as there was originally to contract, and that the intent to rescind should not be inferred without some act which points unmistakably to that conclusion. There is no more reason for holding that the abandonment of the ship was a rescission of the contract of affreightment than that such abandonment was a renunciation of all the owner's title to the ship in case she were subsequently rescued. Whether, if Ward & Company had insisted upon the ship carrying out her contract they might, in case of refusal, have had a cause of action, it is unnecessary to consider. It view of the severity of the storm, and of the danger of remaining on board, the effect of her abandonment on the contract probably never entered the mind of the master. Such abandonment was not a failure to perform the contract in any particular, since it was the result of an overwhelming necessity, and if the vessel were

rescued. the master might repair and continue the voyage, or trans-ship the cargo to another vessel after the extent of the damage had been ascertained. He might indeed have supposed that the ship was irretrievably lost, but both parties took the chance of its being rescued and taken to a port of safety, when the question would then arise whether prudence required her to be repaired, or the cargo trans-shipped.

In such case the same question arises as if the ship had met with a disaster, and been navigated into a port by her own crew. We think it makes no difference in principle whether a tug is hired by the master to take his ship into port, or a tug in the employment of another person comes along and picks her up. If the cargo-owner had himself rescued the vessel he might doubtless have declared the contract rescinded, but it is quite otherwise if the vessel be rescued by her own master and crew, or be taken in tow by a third party.

Applying the doctrine of the opinion, it would follow (and such are the English cases of *The Kathleen* and *The Arno*) that if the vessel be abandoned near her port of destination and towed into such port by a salving tug, she loses her whole freight and cannot even recover on a *quantum meruit*, though the whole voyage be performed.

This conclusion seems so irreconcilable with natural justice that we are constrained to dissent.