THE APPAM.

(District Court, S. D. New York. July 3, 1917.)

1. SHIPPING ⬤⇒154—LIEN FOR FREIGHT—NATURE.
    A normal freight lien is possessory only under general maritime jurisprudence.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

2. SHIPPING ⬤⇒154—LIEN FOR FREIGHT—NATURE.
    Under British law, if bills of lading providing that freight was due on shipment and should be considered as then earned and paid on demand, ship or goods lost or not lost, and that the owners should have a lien for the freight, gave a lien for freight payable, but unpaid in advance, it was inchoate when the ship and its cargo was captured by a German naval vessel, as the lien could not be exercised en route.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

3. WAR ⬤⇒25—CAPTURES AT SEA—ENEMIES' VESSELS AND GOODS.
    The capture of a British vessel and cargo by a German naval vessel was lawful, and the captor succeeded to the rights of owners of both the hull and cargo, subject to the action of a competent prize court.
    [Ed. Note.—For other cases, see War, Cent. Dig. §§ 111–113, 120–123.]

4. SHIPPING ⬤⇒154—LIEN FOR FREIGHT—LOSS.
    The capture of a vessel by the enemy under the laws of war severed the contractual relations between the shipowners and the shippers, and abrogated any lien for freight then existing.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

5. SHIPPING ⬤⇒146—FREIGHT—AWARD OF FREIGHT PRO RATA.
    In litigation on the instance side of the admiralty court over a British vessel, captured at sea by a German naval vessel and sent to an American port, where it was forfeited by the captor's violation of the American neutrality laws, the court could not disregard the severance of the contractu-

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

al relation between the shipowners and the shipper by capture, and award pro rata freight as in prize cases.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 508.]

6. SHIPPING ⬅⬎154—LIEN FOR FREIGHT—LOSS.

In determining whether the owners of a British vessel, captured by a German naval vessel and forfeited by its captors by their violation of the American neutrality laws, have a lien on the cargo for freight, the personal liability of the shipper or consignees is immaterial.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

7. SHIPPING ⬅⬎154—LIEN FOR FREIGHT—LOSS.

Where a British vessel was captured by a German naval vessel and brought within American waters, where it was forfeited by its captors' violation of the neutrality laws, and the vessel was restored to the possession of its original owners, the contract of carriage did not revive on repossession, so as to give the shipowners a lien on the cargo for freight.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

8. EVIDENCE ⬅⬎43(1)—JUDICIAL NOTICE.

Where 14 months elapsed between the capture of a vessel sent into an American port and its restitution, on the ground that its captors had forfeited their rights by violating the neutrality laws, judicial notice will be taken that such time is less than might reasonably have been expected, in view of the certainty that the matters involved would be bitterly defended at law and by diplomatic action.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 62.]

9. SHIPPING ⬅⬎102—CARRIAGE OF GOODS—LAW GOVERNING.

A British vessel, bound from Africa to Liverpool, was captured by a German naval vessel and sent into an American port, where the shipowners filed a libel for its possession, subsequently awarded to them for the captors' violation of the American neutrality laws. The owners of the cargo filed a libel, separately demanding such cargo, without objection from the shipowners. *Held*, that the voyage to Liverpool was totally abandoned, and, as the voyage ended in the United States, or was there abandoned intentionally, the rights of the parties were governed by the laws of the United States.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 400.]

10. SHIPPING ⬅⬎154—LIEN FOR FREIGHT—LOSS.

The shipowners had no lien for freight on the cargo, as a carrier cannot preserve a lien for freight where he totally abandons the carriage of the goods, even though the abandonment is under force majeure.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520.]

In Admiralty. Libel by the British & African Steam Navigation Company, Limited, against the proceeds of the cargo of the Appam. On hearing on exception to libel. Libel dismissed.

R. J. M. Bullowa, of New York City, for libelant.

James K. Symmers, of New York City, for claimant.

HOUGH, Circuit Judge. This pendant to the celebrated litigation over the Appam (243 U. S. 124, 37 Sup. Ct. 337, 61 L. Ed 633) seeks to raise the single question whether, under the facts shown and the law of Great Britain, a lien for freight exists in favor of the Appam's owners against the late cargo of that vessel or the proceeds thereof.

The action is in rem, and the res proceeded against is money produced by sale of cargo—a sale in part conducted by those to whom the

cargo was finally awarded, and in part a judicial sale pendente lite of so much of the lading as was confessedly perishable.

The present hearing is in form upon a peremptory exception to the libel; but by stipulation filed the court has before it all the facts shown by the records in the main litigation, a knowledge of how and by whom those causes were promoted, the decisions of British courts, and the views of text-writers of authority. It is really a final hearing.

The Appam loaded at sundry ports on the west coast of Africa, and (approximately) had accomplished about 2,500 miles of her voyage when captured by the German cruiser Moewe; she had still about 1,500 miles to cover before reaching her port of delivery, Liverpool, and when surrendered to her owners, pursuant to mandate of the Supreme Court of the United States, was at Hampton Roads, and about 3,000 miles from her original destination. Thus she had conveyed her cargo about 1,000 miles nearer Liverpool than it was on shipment, and three-fourths of the transport remained unaccomplished.

The first proceeding against or for the Appam was a strict libel of possession, brought by the present libelant as owner of the hull. Shortly after it was filed, the Appam's master, as agent for insurers of cargo consignees, filed an independent libel for possession of cargo. The underwriters had paid a total loss on proof of capture, and it is of course that they stand in owners' shoes. The manifesting of the vessel shows that the cargo was mostly consigned to shippers' order, but actual ownership at date of capture is unknown and immaterial.

The sale of perishable goods was by consent of proctors for both ship and cargo, but was without prejudice to any lien or right thereto on the part of the ship. No assertion of lien for freight was made in the main litigation, and on conclusion thereof in the District Court for the Eastern District of Virginia (234 Fed. 389) the proceeds of all cargo sales were deposited in New York, and this libel filed against the same. The theory of action is that the lading of the Appam was shipped in British possessions by British subjects to an English port on an English steamer, under bills of lading which specifically agreed that:

"Freight is due on shipment, and shall be considered as then earned, and shall be paid on demand, ship or goods lost or not lost."

It was further agreed that the shipowners—

"should have a lien and right of sale * * * over the goods shipped under this B/L, not only for the freight and charges due thereon, whether payable in advance, or not, but also for all amounts in any wise to become payable to them under the provisions of this B/L, although the same may not then be ascertained or payable."

The libel therefore asserts a conventional lien for the entire freight, none of which was in fact paid or demanded at, on, or after shipment and before capture. So far as this court knows, the present suit is the only effort at collection. Unless the lien insisted upon can be sustained, the shipowner cannot recover, for the Appam's voyage has never been completed, and right delivery tendered. I assume that the shippers are liable in personam on the bills of lading, and either at law or in admiralty, because they agreed to pay the freight, and upon a valuable consideration. On this point no difference is thought to exist

between our law and that of Great Britain. National, etc., Co. v. Internat., etc., Co. (C. C. A. 2d) 241 Fed. 861, —— C. C. A. ——.

[1] But the nature, under British law, of the lien sought to be created by these bills of lading, is not so clear. A normal freight lien is possessory only under general maritime jurisprudence (The Bags of Linseed, 1 Bl. 108), though frequently held to have survived even manual delivery, owing to circumstances, varying with every case, and showing intent expressly or by implication. No lien is created by the agreement to pay freight before fulfillment of voyage (How v. Kirchner, 11 Moo. P. C. 21; Kirchner v. Venus, 12 Moo. P. C. 361), and whether English law will recognize a lien for "something contracted to be paid in advance" is at least doubtful (Gardner v. Trechmann, 15 Q. B. D. 159).

It is obvious that this question of lien is wholly apart from that of personal liability, assumed by a consignee or indorsee of the bill, who demands delivery on the strength of the bill, assuming a document such as that issued by the Appam. To be sure, this distinction is rarely important, for to one who takes goods by virtue of the bill of lading contract it is immaterial whether he discharges a lien or pays on the contract; he pays just the same. But in this instance jurisdiction depends solely upon the asserted lien. The fact that there are persons individually liable (perhaps) in England or Africa is of no moment here.

[2] The Privy Council cases last cited, or their doctrine, have not met with entire acceptance (see Carver on Carriage by Sea, passim), but this much seems clear to me upon reason: The lien for freight payable (but unpaid) in advance certainly could not be exercised en route; the Appam could never have stopped at some convenient place and sold enough of her cargo to get what the shippers had agreed to pay before she sailed. In other words, the lien only ripened and became enforceable upon readiness to deliver, or at least arrival at destination, unless some other exception or proviso of the bills of lading excused performance on the part of the ship. The lien was therefore plainly inchoate when ship and cargo fell into German hands, and it is difficult to see how in its nature it differed from the common freight lien of maritime jurisprudence.

[3] These considerations seem to justify a statement of some legal propositions thought to be undoubted and which I think lie at the bottom of this case. The capture of the Appam and cargo was lawful; in a legal sense there was nothing wrong about it; ship and lading were prize, and the captor succeeded to the rights of owners of both hull and cargo; the captor's title was subject to the action of a competent prize court, and to that extent was inchoate. This ship and lading never got before a prize court. The captor's title and possession was forfeited, not for any violation of international law, but for an infraction of American law, and restitution decreed because of a violation of American neutrality; that is, of our own fixed ideas of what could and should be done in our own waters. The private owners of hull and cargo profited by the tort committed in the territorial waters of the United States and against the United States. This was the result of repeated rulings which Justice Story thought not wholly logical,

for he evidently inclined to the opinion that the sovereign alone could complain of such a public wrong as the prize crew from the Moewe committed when they overstayed their time in Hampton Roads. The Santissima Trinidad, 7 Wheat. 283, 5 L. Ed. 454.

As has been indicated, counsel seem to agree that the effect of this series of occurrences is to be ascertained by British law. If so, no more than analogies can be found, for no such transfer and retransfer of possession as that of the Appam and her cargo is known to have happened in the British domain.

Two analogies suggest themselves—marine disaster and recapture. To the first I will revert. The doctrine of freight upon recapture, as put by Lord Stowell in The Racehorse, 3 C. Rob. 196, The Martha, 3 C. Rob. 106, and especially The Friends, Edw. 246, has been applied during the present war to cases of seizure of enemy cargo on British vessels in The Iolo [1916] P. D. 206, and The Juno [1916] P. D. 169, and pro rata freight usually awarded.

These cases (and others new and old) rest, however, on the assumption that what is before the court is a seizure jure belli, that the case is one of prize, and that consequently all incidental matters arising between the parties in interest, not only may be adjusted but must be adjusted in the prize court, whose jurisdiction is exclusive, once the fact of prize is established, which fact also must be there adjudicated. The Siren, 7 Wall. 162, 19 L. Ed. 129. But whether full or pro rata freight is allowed, the award is ex æquo et bono, and not by virtue of any contract, for the contract between ship and cargo owners must be held to have "ceased by the act of unlivery." The Hoffnung, 6 Rob. 231; The Corsican Prince [1916] P. D. 195. Cf. [1916] 2 K. B. 202. Yet even in the prize court, if there was total defeat of the object of the voyage, as by sale of the goods, no freight at all was allowed. The Louisa, 1 Dods. 317.

[4] While unloading has thus been regarded as symbolic of severance of that relation in which "the ship is bound to her freight and the freight to the ship," what ends and abrogates the contract of affreightment cannot be the mere episode of unlading—it is the fact of capture, of seizure jure belli, which by more potent law severed the contractual or conventional relations of peaceful shippers and carriers. Curling v. Long, 1 B. & P. 637.

It would be absurd to assert that after the prize crew took over the Appam she was any longer fulfilling her contract to carry freight for hire; indeed, she was specifically excused from so doing by some of the oldest clauses of the historic bill of lading, and if the contract of carriage ends, the conventional lien embodied in and created by that contract falls with it, no matter whether such lien was at the moment of capture inchoate or perfected, or for freight moneys prepayable or otherwise.

Following the analogy of recapture, that occurrence does not permit the courts, either maritime or of common law, to make a new contract for the parties; no action will lie for a quantum meruit (St. Enoch, etc., Co. v. Phosphate, etc., Co. [1916] 2 K. B. 624; The Corsican Prince, supra; The Friends, supra), but the prize court may, jure belli

(so to speak), do the fair thing, because the contractual relation has ceased, and it often has done so, somewhat to Justice Story's discontent (The Nathaniel Hooper, 3 Sum. 542, Fed. Cas. No. 10,032).

[5] All the litigation over the Appam has been on the instance side; this court cannot disregard the severance of contractual relation by capture, not condemnation; nor has it in this case any right to award pro rata freight as in prize; nor in any other way, for there is no proof of a contract or agreement therefor.

[6] I am therefore compelled to the opinion that by British law, it is (1) doubtful whether a lien differing from that ordinarily growing out of the carriage of goods would be allowed by reason of the wording of the Appam's bills of lading; (2) if such lien was created it rested solely upon a contract which was abrogated by capture; (3) the personal liability of shippers is immaterial as is any similar liability of consignees; (4) there being no lien, there is no jurisdiction, and the libel fails.

[7] It is argued that the contract of carriage revived on repossession; no authority sustains this view, nor does the analogy of recapture assist. If a recaptor delivered the goods at destination, or permitted the shipowner so to do, subject to salvage, freight was due. But if the recaptor made delivery the shipowner did not fulfill his own contract, and no more did he do so if he tendered the cargo with a burden of salvage attached. The freight was due, no matter who delivered, if the goods were in good order; but the contract was not fulfilled. Ex parte Cheesman, 2 Eden, 181, holds no more than this; its dicta are inconsistent with later and greater authority.

The foregoing is my opinion on the matters raised in argument; subsequent reflection upon this novel case has led to the view that it does not depend upon British law, but is a matter to be settled by our jurisprudence in favor of the claimants. The Appam entered our harbor in lawful possession of her captors; by a subsequent infraction of American law, and in accord with rulings thought to be peculiarly American, the owners of hull and cargo severally regained their respective properties. It was proximately due to the law of the United States that this good fortune fell to them.

If by our law they severally got back what had once been their own, then by our law their respective rights to what they got must be admeasured, unless the obligation of a contract good where made is to be respected and enforced. These claimants, as libelants (practically), separately demanded the cargo as their own; these libelants never objected, yet such asserted and ultimately granted right of possession was wholly inconsistent with any existing or continuing relation between ship and cargo or the owners thereof. The evidence of that relation was the bill of lading, which as against the prize master was nothing; in truth and in law the Appam had become a mere receptacle in which the captor respondent kept what he had taken both from the carrier and the cargo owner; the latter got his own cargo; the former acquiesced in the proceedings; certainly he got back nothing but his ship.

[8] It is too clear to require more than statement that the efforts to recover Appam and cargo were serious matters, sure to be long contested, certain to be bitterly defended at law and by diplomatic

action, and of most doubtful issue. Fourteen months elapsed between capture and restitution, and judicial notice is taken that such time is less than might reasonably have been expected as the life of such a litigation.

[9] These facts raise the question whether a year and more ago there was any intention on the ship's part to continue the voyage and deliver the cargo. I think but one answer is possible: There was no such intent; the voyage to Liverpool was totally abandoned. If such is the fact the analogy of recapture is not nearly as close as that of marine disaster. The Appam was much more like a derelict restored to owners free of salvage through misconduct of salvors (a thing barely possible) than she was like a recaptured vessel. It clears the matter somewhat to stay on the instance side of the court.

To be sure there was no physical injury to the ship, but the disaster to the joint interests of hull and cargo was quite as great as that wrought by many a storm. If in fact the voyage was ended in the United States, or the original voyage there abandoned, and so ended or abandoned, by intent, the rights of parties are adjusted by our law and The Eliza Lines, 199 U. S. 119, 26 Sup. Ct. 8, 50 L. Ed. 115, 4 Ann. Cas. 406, applies, a case which, however, proclaims its adherence to English precedent.

[10] Let the lien agreed upon be given as wide a scope and great a force as can be contended for, and it is still true that no carrier can preserve any lien for any freight against any cargo, if even under force majeure he totally abandons the carriage of the goods intrusted to him; and this is what I think the Appam did—indeed, it was the only possible thing to do under the circumstances.

The result is the same, and the libel must be dismissed, with costs.