## OWENS v. BREITUNG.

(Circuit Court of Appeals, Second Circuit. December 8, 1920.)

No. 6.

1. Shipping ⊚═152—Shipper may recover prepaid freight for nondelivery.

If the goods shipped are not delivered, no freight is earned, and the shipper may recover the freight, if it was prepaid.

2. Shipping ⊚═152—Carrier held to have rendered carriage after capture impossible.

On a libel to recover prepaid freight because of the shipper's failure to deliver the cargo at the port of destination after capture of the vessel, where libelant had voluntarily accepted the cargo at the port in which the captured vessel was taken, and had sold it there for the full price at destination, thereby preventing the carrier from keeping his contract, if he had been able to do so, there can be no recovery of the freight.

3. Shipping ⊚═146—Carrier held entitled to full freight after capture.

A shipowner, who was prevented from keeping his contract of carriage after capture of the ship by the shipper's sale of the cargo at the port of capture, is entitled to retain the entire freight prepaid for the voyage, not merely freight pro rata itineris.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Tom B. Owens, trading as Tom B. Owens & Co., against Edward N. Breitung. Decree for respondent, and libelant appeals. Affirmed.

Harrington, Bigham & Englar, of New York City (D. R. Englar and Oscar R. Houston, both of New York City, of counsel), for appellant.

Katz & Sommerich, of New York City (Marvell C. Katz and O. C. Sommerich, both of New York City, and Edwin M. Borchard, of New Haven, Conn., of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

PER CURIAM. [1] The libelant's case is quite without equity. Concededly the general rule in this country is that, if goods are not delivered, no freight is earned, and the shipper may recover the same, if prepaid. National Steam Navigation Co. v. International Paper Co., 241 Fed. 861, 154 C. C. A. 563.

[2] In the present case it was known to all concerned before the voyage began that, though the steamer was to be seized as enemy property, there would be no condemnation of the cargo, which was to be bought or forwarded to destination by the seizing government. Before the voyage to Rotterdam was completed, the steamer was seized by a French cruiser and brought into the port of Brest. There the libelant voluntarily accepted the cargo and sold it to the French government for the full price he would have received, had it been delivered by the steamer at Rotterdam and from there forwarded to Bremen, which price included the prepaid freight. The sum and substance of the mat-

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ter is that the libelant agreed to substitute the port of Brest for the port of Rotterdam, and by so doing made it impossible for the respondent to deliver at Rotterdam, as the bill of lading entitled him to do by transshipment, if the steamer for any cause were prevented from proceeding in the ordinary course of her voyage.

[3] The only debatable question is whether the respondent was entitled to retain anything more than freight pro rata itineris; but upon all the facts in the case we think he was rightly awarded full freight. Carver on Carriage of Freight by Sea, § 307. Judge Hand's opinion will be found below.

The decree is affirmed.

### Opinion of Learned Hand, District Judge.

This is a libel in personam for the recovery of freight paid in advance, under the following circumstances:

On December 9, 1914, the libelant entered into a contract with E. V. Novelly & Co., New York, acting on behalf of the respondent, by which Novelly & Co. agreed to tender the steamer Dacia, then the Martha and under the German flag, but to be changed to American registry, for the shipment of 11,000 bales of cotton from Galveston, Tex., to Bremen, Germany. The steamer was to be tendered at Galveston in the month of December, 1914, and was guaranteed to sail on or before January 15, 1915. It was provided that the vessel need not be insured with the United States government as to war risk, except for the excess of $750,000 for which the United States had already quoted war risk on the cargo. The freight to be paid in advance was 3 cents a pound.

The Dacia started loading about January 7, 1915, and by the 10th or 11th had lifted 4,000 of the 11,000 bales. Meanwhile, however, difficulties had arisen in connection with the cargo's war risk insurance, because the British government had indicated a purpose not to permit her transfer, as a German ship, to neutral registry pending the war. On the 10th or 11th the loading was stopped, and on the 16th one Parker, assistant director of the War Risk Bureau, wired to Lamar, the libelant's agent, that the British government had decided not to allow the Dacia to go either to Rotterdam or Bremen, and would doubtless seize the ship, though it would protect the owner of the cotton against loss. Upon this news, representatives of both parties had an interview in New York on the 17th, at which it was agreed that the port of delivery should be changed from Bremen to Rotterdam and the freight from $3 to $2.90 per 100 pounds, the respondent declining to release the libelant from the contract and insisting upon making the voyage. He threatened to libel so much of the cotton as had already been laden for the whole freight, unless these terms were accepted. The loading then proceeded, and a bill of lading in the usual form was delivered to the libelant on January 22d; the cargo having been meanwhile insured on January 21st.

On that day the British ambassador wired the respondent's agents that the British government was prepared to arrange for the transfer of cotton at Rotterdam, loading and unloading at their expense, so as to guarantee the owners of the cargo, if consisting solely of cotton, against loss, but that the question of the transfer of flag must be tried out before a prize court. He asked what kind of guarantee the respondent would give if the Dacia was released as requested. The ship refused to sail before the payment of freight, which was made on the 1st day of February. On February 2d the Secretary of State wrote to the libelant, saying that he was laying his (the libelant's) preference regarding the disposition of the cargo before the British ambassador, but what that preference was does not appear. On the same day the libelant's agent wrote to his lawyer, saying that it did not make much difference to what English port the Dacia proceeded, as the cargo was quite content to let England select the port, if that government so desired.

The Dacia was seized by a French cruiser on February 27th off the coast of France and was taken to Brest as prize. Her crew were put ashore and sent back to America, and she was later condemned by a French court and sold.

On March 3d, after news of the capture had been confirmed, the libelant's agent wrote to the War Risk Insurance Bureau that they were prepared to let France have the cargo at the Bremen price without prize court proceedings, because they especially wished to avoid the delay, "and we prefer that the cargo be not forwarded at the expense of the War Risk Bureau at Rotterdam, because we would have to provide transportation and pay freight from Rotterdam to Bremen. Of course, we know you have the right so to forward the cargo, if you elect to do so. If it went forward, we would also have to pay damages for late sailing from United States."

Apparently in answer to this, the Secretary of State wired the libelant that he was inquiring of the British government regarding the disposition of the cargo. On March 5th the respondent telegraphed the Secretary of State, asking him to request the French government to release the Dacia on bond, the prize proceedings to continue, but, if France meant to detain the cargo he could see no objection to its being undelivered at France's expense and allowing the Dacia to return direct home.

On the same day the libelant wrote again to the War Risk Insurance, saying: "We at your request some time ago advised State Department that we preferred and would accept from England Bremen sale contract price, and not request forwarding the cargo, and having made all our arrangements accordingly we would be seriously embarrassed if the cargo were not forwarded to destination."

On the 8th the Secretary of State wired the respondent that the French government was not disposed to examine closely the possibility of enemy ownership of cargo, and that probably the shipper would be given a chance of sending the cargo to destination or receiving payment in France, and asked whether, in view of the above, the respondent wished his request transmitted to the French government that the Dacia be released in bond and be allowed to return to the United States. On the 9th the respondent said that he did wish his request transmitted, but no answer arrived till April 7th, saying that it was a matter for the prize court. Later, on April 22d, came a categorical refusal.

On March 8th, the War Risk Bureau wired the libelant's agent and wrote the libelant that the French government would follow the understanding of the British government and either purchase or forward the cargo. The Secretary of State on March 10th advised the French government that the cargo was willing to accept the offer of purchase at the full Bremen price, to which the French government assented before the 13th. The sale was later completed, the bills of lading, invoices and the insurance policy being all turned over by the Guaranty Trust Company, which had advanced money on the same.

The suit was brought on the theory that the voyage was not completed, the freight was never earned, and that it might therefore be recovered in accordance with the well-established rule under the American and continental authorities.

The libel does not very definitely declare the theory of law upon which it rests, but to be within the admiralty jurisdiction of this court I suppose it will hardly be contended that it can depend upon anything else than the breach of the contract of December 9, 1914, and of the bill of lading. The respondent promised to carry the cotton to Rotterdam and failed to do so, but this was not a breach, because the fifth exception in the bill of lading excused performance upon capture. The case might, therefore, be thought to depend upon whether this excuse went further than a mere suspension, and whether the refusal amounted to a final termination of the respondent's obligations. However, he does not sue for breach of the obligation to complete the voyage, and indeed alleges it was necessarily at an end by the capture. Clearly he must so allege, since by his sale of the cargo he terminated the respondent's opportunity, reserved under the third exception of the bill of lading, to transship and to complete the voyage, if it remained practically open for him to do so. His claim rests upon the assumption that the capture completely dissolved the contract and that his right to recover the whole freight arose at once.

Whether that right arose from any breach of the maritime contracts between the parties might indeed have more than an academic interest, had the respondent raised the question of jurisdiction; but after U. S. v. James W. Elwell & Co., 250 Fed. 939, 163 C. C. A. 189, that question is not important, where there is independent jurisdiction over the subject-matter and the parties are content to allow the cause to proceed. It is true that there is here no allegation of diverse citizenship, but only of residence, yet the record contains evidence that the parties are citizens of different states and it would not. therefore, be necessary to dismiss the libel, whether it be at law on a quantum meruit for money paid, or in the admiralty on a maritime obligation. Possibly it is not necessary, therefore, to decide which of the two this should be deemed, except so far as to observe that to say that the law implies a stipulation in the contract to repay the freight is to state a fiction, and to disregard the rule in its origin. Watson v. Duykinck, 3 Johns. (N. Y.) 335; Griggs v. Austin, 3 Pick. (Mass.) 20, 15 Am. Dec. 175. The law, of course, does impute an obligation to the carrier, but not because of any promise. It presupposes that the contract does not cover the case, and yet that the mutual relations of the parties are so unjust as to require some relief.

Coming, then, to the merits of the case, it must first appear, upon the libelant's theory, That he is not himself in default under the contract, since, if so, he cannot sue either upon the maritime contract or on a quantum meruit. This raised the question whether, when he sold his cargo to the French Republic, the respondent's right to earn his freight was at an end, because by that sale the respondent was not only excused, but finally prevented, from further performance. If at an end, it was, of course, an idle ceremony to give him further opportunity.

The capture of the Dacia was not, in fact, necessarily a termination, even of her own power to complete the voyage. As early as January 21st the respondent had asked the British ambassador whether, in the event of the capture, which all knew would occur, he might be allowed to continue the voyage under guaranty, and the ambassador had not only assured him that the cargo would be forwarded, but had inquired as to the kind of guaranty he intended. He had, therefore, some reason to suppose that his proposal was not wholly unwelcome, and on March 5th, four days after he heard of the capture, he repeated it. If France meant to detain the cargo as well, he asked, would it not be possible at least to release the Dacia. This wire our Secretary of State answered on the 8th, repeating the willingness of the French authorities to forward the cargo, and asking if, in view of this, whether the respondent still wished the request to go forward that the vessel would be allowed to proceed. He answered on the 9th that he did, and the request went forward on the 10th, and was apparently answered on April 7, 1915, by the statement that the release must be taken before the prize court. Later, on April 22d, or some six weeks after his request was forwarded, the respondent for the first time got a definite refusal to his cable. During all this time his master remained in France.

Now, all this shows, it is true, that the respondent could not have completed the voyage with the Dacia; but it also shows that he was apparently trying to get his vessel released for that purpose, in case France did not mean to hold the cargo. At least that is a tenable interpretation, and the libelant is very far from showing, as he must, that the owner had abandoned or ought to have abandoned the voyage. Capture, says Mr. Justice Story in The Nathaniel Hooper, 17 Fed. Cas. 1191, No. 10,032, never dissolves the contract of affreightment, but only suspends it till restitution or condemnation. All this effort was made, so far as appears, without any knowledge on the part of the respondent of the libelant's negotiations with the French authorities. I have no right to say that it was in bad faith.

Granting, however, that all such efforts were bound to prove abortive, does that concession free the libelant from default? I think not. The respondent's rights did not end with the Dacia; as I have already observed, he had the express right to tranship, and it must never be forgotten that no trouble had arisen over the cargo, but only over the bottom. Furthermore, both the

270 F.—13

British and French authorities had repeatedly from the outset assured both parties that the cotton could go forward. If, therefore, the respondent was sure to fail in getting the Dacia released, what reason have we to suppose that he would not have tried, and would not have succeeded, in forwarding the cargo by another bottom? He had much at stake in avoiding a breach of his contract, and was acting under legal advice. It is answered that the Order in Council of March 1, 1915, forbade the shipment, but that is not wholly clear. The language is: "Sailed from her port of departure after the 1st of March, 1915."

Whether this would apply to the continuation of a voyage begun in January is not at all certain. But the answer would be quite irrelevant, because both powers were acting in concert, and had most unequivocally made an exception in this case. It seems to me not in the lease improbable that they would have allowed the respondent, in view of his interest in the freight, to act as the carrier in completing the voyage in case the libelant had wished the cargo forwarded. It would have saved them the expense of the voyage, and would not have added any complications that I can see. Indeed, the respondent's connection need only have been formal to make the performance his. At least, he had the right to attempt that course, after they refused to release the Dacia.

In answer the libelant refers to Lamar's testimony and Parker's. All that Lamar says is that Cone Johnson had told him that the cotton would not be allowed to go "to Germany," which is quite possible, but irrelevant to a suit about carriage to Rotterdam. Parker says that M. Jusserand told him on the 18th that the cotton would not be "forwarded." If this means "forwarded to Germany," it is irrelevant; if it means "forwarded to Rotterdam," it must be a mistake, or else the whole contemporaneous documentary evidence is wrong, of which there is so much. It was the obvious purpose of both powers to protect the cargo, not only by paying its value, but, if the shipper wanted it, by forwarding it to Rotterdam.

It appears to me, therefore, that the respondent's right to save his freight by completing his performance was by no means at an end, and that he had in no sense given any evidence of abandoning the cargo. It is quite idle to speculate on what he would have done after he learned that he could not get the vessel released. We do not know when he learned of the sale, which information, when he did, excused all further performance, but do know that he got no definite answer about the release for nearly a month. During that time he had the right to hold the cargo, if acting in good faith. Thereafter he had a reasonable time to transship it.

Those being the facts, what did libelant do? On the 3d, two days after hearing of the capture, Lamar wrote the War Risk Bureau, asking that the cargo should not be forwarded by the Bureau. On March 5th he wrote again, showing that some time before he had asked the British not to forward it in case of its capture by them. On the 8th his agents got word that the French authorities gave him the option of purchase or forwarding, and on the same day he was sent notice by the Bureau that his preference for purchase would be communicated to those authorities. On March 10th our Secretary of State did so advise both the French ambassador and our own ambassador in France. The bargain had been struck some time before the 13th.

Now, if the rule were that the shipper might recover, unless the owner could show that he would and could have completed the voyage, the libelant here might recover; but it is not so. On the contrary, it is he who must show that the contract is at an end, either by the owner's voluntary abandonment of the voyage, or, what is regarded as the equivalent, by such circumstances as make it inevitable that he must abandon it in the future. In short, while the owner has any reasonable chance to perform, as in any other contract, he must be allowed to do so, and the risk of terminating that chance. must fall upon the shipper who chooses to withdraw the cargo. The Eliza Lines, 199 U. S. 119, 26 Sup. Ct. 8, 50 L. Ed. 115, 4 Ann. Cas. 406; Case v. Baltimore Ins. Co., 7 Cranch, 358, 3 L. Ed. 370; The Appam (D. C.) 243 Fed. 230; Sampayo v. Salter, 21 Fed. Cas. 286, No. 12,277; Hunter v. Prinsep, 10 East, 373; Dunnett v. Tomhagen, 3 Johns. (N. Y.) 154; Lutwidge v. Grey

(reported in Luke v. Lyde, 2 Burr. 882). Indeed, in Luke v. Lyde, 2 Burr. 882, 888, Lord Mansfield went so far as to say that the master should have his freight pro rata itineris, unless the shipper asked him to provide a new ship to complete. A fortiori, when the shipper withdraws the cargo while the master is still negotiating to secure the release of his vessel.

Of course it is easy to say that the efforts of the respondent were not in good faith, that everybody knew that the Dacia would never be allowed to reach Rotterdam, and that the respondent cared nothing about the cargo because he knew it would be protected. All this is probably quite true; the affair was designed by everybody to be a test case, and probably all knew before the vessel sailed that the cargo would be purchased by the captors. However, the libelant, who must insist upon the letter of the contract, cannot afford to suggest such considerations, because they militate equally against him. If the respondent did not expect the delivery to be made at Rotterdam, neither did he; indeed, he wanted anything but that, as he confessed. He was much better content to get his whole Bremen price at Brest, free of the costs of transit from Rotterdam and from the difficulties arising from a late delivery. If the consideration of his payment was transportation to a place where he could receive the full price he had bargained to get, he has got that consideration. He must therefore be content to treat the facts as though both sides actually intended to go to Rotterdam—as perhaps the respondent did, and as certainly he did not.

I find, therefore, that the libelant sold the cargo before the respondent had either abandoned the voyage or it had definitely appeared that he could not complete it under his rights in the bill of lading. The libelant is therefore in no position to sue. It becomes on this account unnecessary to consider whether, if the voyage had been wholly frustrated before the libelant sold the cargo, the libelant could have recovered the whole freight or any part.

The libel is dismissed, with costs.